Timothy L. **MERRIAM, an individual; Justine Merriam, individually and as next best friend of Christopher Merriam, Kayla Merriam an Collin Merriam, minors Plaintiffs,**

v.

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, a corporation; Landstar Ranger, Inc., a corporation; and Gallagher Transportation Services, a division of Arthur J. Gallagher and Co. Kansas City, a corporation, Defendants.

No. 4:07–cv–130.

United States District Court, S.D. Iowa, Central Division.

Oct. 7, 2008.

Marc A. Humphrey, Humphrey Law Firm, P.C., Urbandale, IA, Alan O. Olson, Olson Law Office PC, Des Moines, IA, for Plaintiffs.

Daniel F. Church, McAnany Van Cleave & Phillps PA, Reoland Park, KS, Stephen E. Doohen, Whitfield & Eddy, PLC, Des Moines, IA, Robert E. Konchar, Moyer & Bergman, PLC, Cedar Rapids, IA, Abbe M. Stensland, Coralville, IA, for Defendants.

## MEMORANDUM OPINION AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

ROBERT W. PRATT, Chief Judge.

Before the Court are three motions for summary judgment. First, on August 1, 2007, Defendant Landstar Ranger, Inc. ("Landstar") filed a Motion for Summary Judgment. Clerk's No. 20. Plaintiffs filed a resistance to Landstar's Motion on March 6, 2008. Clerk's No. 33. Plaintiffs filed a supplemental resistance to Landstar's Motion on April 8, 2008. Clerk's No. 38. Landstar filed a Reply on May 1, 2008. Clerk's No. 46. Second, on April 11, 2008, Plaintiffs filed a Motion for Summary Judgment against Defendants National Union Fire Insurance Company ("National Union") and Gallagher Transportation Services ("Gallagher"). Clerk's No. 40. Plaintiffs filed a "Supplemental Motion for Summary Judgment" against National Union and Gallagher on April 16, 2008.[1] Clerk's No. 44. National Union and Gallagher filed a resistance to Plaintiffs' Motion on May 5, 2008. Clerk's No. 49. Plaintiffs filed a Reply on May 27, 2008. Clerk's No. 57. Finally, National Union and Gallagher filed a Motion for Summary Judgment against Plaintiffs on May 16, 2008. Clerk's No. 55. Plaintiffs filed a resistance to the Motion on June 12, 2008. Clerk's No. 60. National Union and Gallagher replied on June 27, 2008. A hearing was held on all pending motions for summary judgment on July 16, 2008. Clerk's No. 69. The matters are fully submitted.

---

1. Plaintiffs filed Clerk's No. 44 as a "Supplemental Motion for Summary Judgment." The filing is, however, actually a supplementation to Plaintiffs' previously filed motion for summary judgment and is not an independent or additional motion for summary judgment.

## I. FACTUAL BACKGROUND

Landstar is an interstate trucking company that independently contracts with individual truck owners and operators to transport freight. Landstar's Statement of Material Facts (hereinafter "Landstar's Material Facts") ¶ 1. At all times relevant to this case, Timothy Merriam ("Merriam") was an owner-operator, working as an independent contractor for Landstar. National Union's and Gallagher's Statement of Material Facts (hereinafter "Gallagher's Material Facts") ¶ 1.[2] In order to haul for Landstar, every independent contractor is required to provide Landstar with verification that he or she is covered, amongst other things, by a qualified accident or workers' compensation policy. Landstar's Material Facts ¶ 2.[3] If an independent contractor meets certain criteria as articulated by Landstar in the "Independent Contractor Operating Agreement" (the "Contract"), that independent contractor may elect to obtain a blanket trucker's occupational accident policy, also known as a "Contractor Protection Plan" ("CPP"), in lieu of either traditional workers' compensation coverage or the occupational accident insurance. Landstar's Material Facts ¶ 6.[4]

Prior to entering the Contract with Landstar,[5] Merriam[6] had been employed for many years as an over the road trucker for other trucking companies and, as such, had never been required to obtain his own insurance coverage. Pls.' Statement of Additional Material Facts which Preclude Summ. J. (filed in response to Landstar's Motion for Summary Judgment, hereinafter "Pls.' Additional Facts") at ¶ A1–B2.

---

**2.** The Court notes that for purposes of clarity in providing the factual background of the case, it will reference admitted material facts from the Statements of Material Facts of all parties. Though there is substantial and relatively consistent overlap between the parties' factual statements and admissions, the Court considers only the relevant material facts, as admitted between the parties to the motion at issue, in actually ruling on the respective motions for summary judgment.

**3.** The Independent Contractor Operating Agreement between Merriam and Landstar provides:

> INSURANCE: The responsibilities and obligations between CARRIER and INDEPENDENT CONTRACTOR involving insurance will be specified in *Appendix* B. CARRIER will have no insurance responsibilities or obligations pertaining to INDEPENDENT CONTRACTOR or the Equipment other than those expressly stated in this Agreement or mandated by Applicable Law.

National Union and Gallagher App. (hereinafter "Gallagher App.") at 102. Appendix B of the Contract provides in Paragraph 3 that an Independent Contractor must carry workers' compensation insurance or, if certain criteria are met, may alternatively obtain occupational accident insurance. Gallagher App. at 112.

**4.** Paragraph 4 of Appendix B provides:

> *Contractor Protection Plan.* In lieu of obtaining the required workers' compensation or occupational accident insurance coverage specified in Paragraph 3 above, INDEPENDENT CONTRACTOR, if eligible under Schedule O of this Appendix B, may participate in a "contractor Protection Plan" offered through an insurer approved by CARRIER.

Gallagher App. at 112. There does not appear any dispute that Merriam met the criteria of Schedule O and was, therefore, eligible to obtain a "Contractor Protection Plan," or "CPP," in lieu of traditional workers' compensation or occupational accident insurance coverage.

**5.** Merriam signed the Independent Contractor Operating Agreement with Landstar in 2004, though he claims that he never read the agreement prior to signing it. Landstar's Material Facts ¶ 9; Pls.' Response to Landstar's Material Facts ¶ 9.

**6.** Though Merriam is the only individual who was a party to the Contract with Landstar and to the CPP policy, the present action is brought by Merriam, his wife, and his children. Accordingly, the Court will reference "Merriam" and "Plaintiffs" interchangeably throughout this Order.

Merriam had also never sustained an on-the-job injury that would have familiarized him with the benefits of a workers' compensation policy. *Id.* at ¶ A3. In 1999, Merriam began the qualification process to become an Independent Contractor with Landstar.[7] *Id.* ¶ B1. This process was handled entirely by mail.[8] Merriam's contact during the qualification process was a Landstar employee named Kevin Elder ("Elder"), who had offices in Texas and Missouri. *Id.* at ¶ B3. Elder mailed Merriam a packet of information which contained highlighted documents to be filled out and returned and which also contained a flier outlining CPP coverage available through Gallagher. *Id.* at ¶ B4; Elder Dep. at 22–23. There is no dispute that Elder did not provide fliers or information about the two other options for insurance coverage, i.e., workers' compensation or occupational accident coverage. Elder Dep. at 28 (Q: "In the paperwork that you would send the trucker interested in leasing out to Landstar, did you provide any options for workers' compensation coverage as opposed to CPP coverage?" A: "Not that I remember, no, sir."). There is also no dispute that Merriam and Elder never discussed what insurance coverages were necessary before Merriam could successfully complete the qualification process or the

distinctions between workers' compensation, occupational accident, and CPP coverage.[9] Pls.' Additional Facts ¶ B5, Pls.' Response to Landstar's Material Facts ¶ 7. It is also true that Merriam never inquired about his options for insurance coverage, despite the provisions in the Contract discussing requirements for insurance and alternatives regarding what would satisfy those requirements. Landstar's Response to Pls.' Additional Facts ¶ B5. Additionally, Merriam admits that he obtained additional insurance coverage required by the Contract, i.e., "bobtail insurance,"[10] on his own without assistance from Landstar. Merriam Dep. at 290 (Q. "Did you obtain your own bobtail insurance then?" A. "Yeah."). Elder testified that if any driver going through the qualification process had questions about CPP coverage or about Landstar's insurance requirements generally, he would "refer them on down to—to Jacksonville, Florida to the home office to the—the—there was a person down there. We had a contact that handled the CPP and they would work with them, either explain more to 'em about the CPP or other options." Pls.' Additional Facts ¶ 9. Elder further testified that he thought that the "contact," Cindy Chambers, was actually "with Gallagher but [her office was] at headquarters there at Landstar."[11] Elder

---

7. It is not entirely clear from the record why Merriam began the qualification process with Landstar in 1999 but did not enter into the Contract until 2004.

8. Landstar asserts that the process was handled entirely by mail at Merriam's request. *See* Landstar's Response to Pls.' Additional Facts ¶ B2.

9. Indeed, Merriam claims that, "to this day [he] does not have any understanding of differences in coverage between a self-employed workers' compensation policy and the CPP ... offered by Landstar Ranger through the qualification process." Pls.' Additional Facts ¶ B6.

10. It appears that "bobtail insurance" is a type of liability insurance coverage for the tractor/trailer while it is operating on public roadways, as opposed to personal insurance on the trucker, such as that in a workers' compensation or CPP policy.

11. Plaintiffs concede that Landstar is not an insurance company. Landstar's Material Facts ¶ 4. Plaintiffs, however, deny that Landstar is not "in the business of selling insurance" based on Elder's testimony that Cindy Chambers of Gallagher maintained an office at Landstar headquarters and based on the fact that Elder's informational packet contained only an "offering" for CPP insurance, not for any other type of insurance. The Court notes that Elder's testimony about

Dep. at 25.

Regardless of Plaintiffs' understanding of the distinctions between types of insurance coverage, Merriam applied for and obtained a CPP policy from National Union, purportedly under the belief that it was the only option available to him since it was the only "offering" included in the packet of materials provided by Elder. Landstar's Material Facts ¶ 11; Gallagher's Material Facts ¶ 4. Merriam's CPP policy had an effective date of January 1, 2005. *See* Landstar's App. at 47. The policy contained coverage for "occupational accident benefits," as well as for "non-occupational accident benefits." *Id.* at 48–49. Plaintiffs claim it was Merriam's understanding that the CPP plan would provide coverage any time he was outside his truck and that it would also provide death benefits to his wife if he was killed while driving. Pls.' Additional Facts in Response to National Union's and Gallagher's Mot. for Summ J. (hereinafter "Pls.' Additional Facts II") ¶ 3. On January 2, 2004, Plaintiffs received a letter from Gallagher, the claims adjuster for National Union insurance policies, stating: "It is important for you to note the occupational accident insurance policy you have purchased does NOT provide workers compensation coverage in accordance with any state's workers' compensation act. It is not intended as a workers' compensation policy and will NOT satisfy any state law that may require you to obtain workers' compensation insurance." [12] Landstar's App. at 3 8. While Merriam never received a physical copy of the CPP insurance policy itself, he did receive a copy of the Schedule of Benefits for the policy,[13] along with the January 2, 2004 letter from Gallagher. Pls.' Additional Facts II ¶ 4. The January 2, 2004 letter from Gallagher informed Merriam that he could "obtain a copy of the insurance policy that outlines the terms, conditions and exclusions (a/k/a Contractor Protection Plan or "CPP") either via the Internet or by contacting the Gallagher Insurance Coordinator at Gallagher Transportation." Landstar's App. at 38. The letter provided both a contact phone number and an internet address. *Id.*

In the month of March 2005, Merriam was employed as an Independent Contractor with Landstar, and he was covered by the CPP policy issued by National Union. On March 24, 2005, Merriam picked up a load in Sparks, Nevada destined for Cedar

"where" Chambers worked was less than certain:

> Q: Now, let me make sure I understand that. She was—she was actually affiliated with Gallagher but had an office at Landstar?
> A: That I ... couldn't know for sure. I mean ..., all we—we was—you know, all we had was her number and we was told if we had—anybody had questions that we referred them down to her. So I— you know.

Elder Dep. at 25–26.

12. Additionally, the policy provides, under the heading "IMPORTANT NOTICE," the following:

> THIS COVERAGE IS NOT WORKERS' COMPENSATION COVERAGE AND IS NOT A SUBSTITUTE FOR WORKERS' COMPENSATION COVERAGE. PLEASE READ THIS DESCRIPTION OF COVERAGE CAREFULLY.

Landstar's App. at 50.

13. The Schedule of Benefits provided that Occupational Accident Benefits included an accidental death benefit, a paralysis benefit, temporary and continuous total disability benefits, and accident mental expense benefits, amongst other things. Landstar's App. at 40. The maximum "per insured person limit of liability" for occupational coverage was $1,000,000. *Id.* at 41. Under the "non-occupational" provisions of the policy, benefits were payable for accidental death, paralysis, or accident medical expense; however, the maximum "per insured person limit of liability" was $15,000. *Id.*

Rapids, Iowa. Pls.' Additional Facts II ¶ 2. After leaving Sparks, he traveled to Pine Bluffs, Wyoming where he took a three-day fishing trip. Pls.' Additional Facts ¶ C2; Gallagher's Material Facts ¶ 16. On March 29, 2005, Merriam brought his load into Iowa [14] and stopped at his home in Boone, Iowa on a federal Department of Transportation ("DOT") break.[15] Landstar's Material Facts ¶ 14.

Merriam's home is a three acre parcel located just west of Boone, Iowa. Pls.' Additional Facts ¶ 1. He claims that it was not uncommon for him to stop and take his "on duty, not driving" DOT breaks at his Boone home while en route with a load to Cedar Rapids. Pls.' Additional Facts ¶ 4. Merriam also claims that it "was not necessary for him to deviate at all off of his normal route back to Cedar Rapids along

Highway 30" in order to stop at his home in Boone.[16] Pls.' Additional Facts II ¶ A5. Regardless, Merriam's property had two driveways, one purportedly for his personal use vehicles and one he constructed in 1999 for purposes of parking his tractor/trailer [17] between loads or when taking a break while fully loaded. Pls.' Additional Facts ¶ 6. At some point prior to March 29, 2005, an underground waterline that ran, at least in part, under the tractor/trailer driveway was damaged by livestock the Merriams kept on their acreage. *Id.* ¶ 9. A backhoe was utilized to dig up and repair the waterline, and the hole left behind was refilled after the project was completed. *Id.* ¶ 9. During the winter months, the ground where the repairs had been made remained relatively even, but on March 29, 2005, when Merriam stopped

14. Merriam contends that he was scheduled to drop off his load in Cedar Rapids, Iowa on March 30, 2005. Pls.' Statement of Material Facts ¶ 3. There is some contradictory evidence in the record as to when the load was scheduled to be dropped off and when it was actually dropped off. *See* Gallagher App. in Resistance to Pls.' Mot. for Summ. J. at 14 (showing load delivered to Cedar Rapids, Iowa on March 28, 2005). While all parties point out these discrepancies in the documentation, there appears no real dispute that Merriam was under load at the time of his stop in Boone, Iowa and that the load was eventually delivered to Cedar Rapids by someone else, due to Merriam's injuries on March 29, 2005.

15. Plaintiffs consistently characterize Merriam's break as an "on duty, not driving" break. Pls.' Additional Facts ¶ 4; Pls.' Additional Facts II ¶ 4; Pls.' Response to Landstar's Material Facts ¶ 14. All Defendants dispute Plaintiffs' repeated characterization of his break as "on duty, not driving."

16. National Union and Gallagher dispute that no deviation "at all" was required, pointing out that Merriam's home was not located on Highway 30. Gallagher's Response to Pls.' Additional Facts II ¶ A5. Furthermore, National Union and Gallagher point out that "taking Highway 30, as opposed to U.S. [In-

terstate] 80 is a deviation in an[d] of itself from the shortest, quickest route to Cedar Rapids, IA." *Id.*

17. Plaintiffs claims that Merriam constructed the second driveway for his tractor/trailer for several reasons:

First of all, Landstar had very stringent requirements about where you could leave your tractor and trailer when it was fully loaded. The driveway within the fenced in area on [Merriam's] acreage allowed him to provide security for the loads that he was hauling for Landstar. In addition, given the magnitude of his monetary investment in the tractor and trailer, Timothy Merriam wanted his rig secured. Finally, Boone County was very strict about not allowing tractor/trailers to be parked on the gravel roads in the vicinity of Timothy Merriam's home. Clearly, he built that driveway solely for a place to securely park his tractor/trailer while loaded or while unloaded.

Pls.' Additional Facts ¶ 8. Landstar denies that it had "stringent requirements about where you could leave your tractor and trailer when it was fully loaded," pointing out that it only had such requirements when an independent contractor was hauling "high value" loads. Landstar's Response to Pls.' Additional Facts ¶ 8.

at his residence, he discovered that a sinkhole had developed where the waterline had been repaired in the tractor/trailer driveway.[18] *Id.* ¶ 10. Merriam claims that, in an attempt to avoid getting his tractor/trailer stuck in the wet, muddy ground created by the sinkhole, he parked his tractor/trailer on the roadway and got his 1955 International dump truck in order to make repairs to the driveway. *Id.* ¶ 11–12. The dump truck "already had a load of gravel thereon," and Merriam "proceeded to fill the [sink]hole with gravel so that he could effectively park his loaded rig on the specially created driveway." *Id.*

After dumping gravel into the sinkhole, Merriam was unable to get the raised bed of the dump truck to return to its neutral position. *Id.* ¶ 13. After manipulating the controls inside the cab of the dump truck, he stepped outside the cab and reached across the frame of the truck to ensure that the "PTO cable" was not bound up.[19]

*Id.* While reaching across the dump truck frame, the bed of the truck fell on the left side of Merriam's head, his left shoulder, and his left arm.[20] *Id.* ¶ 14. Merriam sustained severe injuries for which he has undergone multiple surgeries; however, his left arm remains entirely nonfunctional. *Id.* ¶ 17. Plaintiffs claim that Merriam has incurred medical expenses in excess of $400,000 and has been deemed permanently disabled by the Social Security Administration. *Id.*

Plaintiffs assert that "[b]ecause they had never been provided with a copy of the [CPP] policy before Timothy Merriam was injured on March 29, 2005, [they] did not even have a clear appreciation of the existence of that policy at the time of [Merriam's] injury." Pls.' Additional Facts ¶ D4. Plaintiffs further claim that they "called Landstar Ranger, Inc. and Mick Ellis, Tim Merriam's dispatch agent after the injury and both Landstar Ranger and Mick Ellis told them there was no insurance coverage available."[21] Pls.' Addition-

---

18. The Court notes that while Plaintiffs' Statements of Material Facts reference a "sinkhole," Plaintiffs' Amended Complaint states: "That in conjunction with his decision to stop at his home in Boone County, Iowa, in as much as he was still on duty, his plan was to spread a load of gravel on a dirt lane where he planned to park his eighteen-wheel fully loaded tractor trailer. Said lane had developed deep ruts [which] gave rise to a risk that the fully loaded tractor trailer ... would get stuck." Am. Compl. ¶ 17

19. Plaintiffs have provided slightly varying accounts of what Merriam was attempting to accomplish by reaching under the bed of the dump truck. In the "Accident Fact Sheet," Plaintiffs reported that Merriam was reaching across the frame of the dump truck to "trip the 'drop lever.' " Pls.' App. at 155. A medical report states that Merriam "stuck his arm underneath . and was wiggling the latch." Gallagher App. in Resistance to Pls.' Mot. for Summ. J. at 23.

20. All Defendants concede that Merriam was injured while fixing his personal dump truck, but deny Plaintiffs' assertions that fixing the

dump truck was done in furtherance of his duties for Landstar.

21. Plaintiffs cite Merriam's deposition at pages 9–10 of Plaintiffs' Appendix in support of this contention. Those pages, however, contain Merriam's affidavit, dated March, 5, 2008, not Merriam's deposition testimony. In his affidavit, Merriam states: "Initially, my wife Justine and I were told consistently that there was no insurance coverage available for my injury. It was not until a man called about purchasing my truck after the injury that he raised the issue about the [CPP] policy through Gallagher. Justine and I then commenced further investigation and confirmed that I had paid for such a policy." Pls.' App. at 9. Plaintiffs also cite a letter addressed "To Whom it May Concern," dated September 30, 2005, wherein he states that he told the man who wanted to buy his truck that "Mick Ellis, my domisile [sic] agent, told me there was no insurance, and he checked with Landstar and they said there was no coverage. My wife called Landstar they told her there was no coverage. Every body told me there was no insurance, so I didn't pursue it any further.

al Facts ¶ D4. Regardless of the reasons for the delay, Plaintiffs did not contact Gallagher about Merriam's injuries until August 30, 2005. Gallagher's Material Facts ¶ 24.

While it is unclear whether Merriam or his wife called Gallagher to report Merriam's injuries on August 30, 2005, an employee of Gallagher named Carolyn Miller ("Miller") filled in an "Occupational Accident Plan Claim Call-in Sheet" ("Call-in Sheet") on that date.[22] Gallagher App. at 27. The Call-in Sheet recites Merriam's name, date of birth, phone number, and reports his address as 1915 West 1 st Extension, Boone, IA. Under the heading, "Accident Information," the Call-in Sheet states that the accident occurred on March 29, 2005 at 10:00 a.m. The "Accident Location" is listed as "727 Linn Street,[23] Boone, IA."[24] Under "description of Accident," the Call-in Sheet states "in driveway (1955 Int'l) went to lower bed—it wouldn't come down—reached across frame then bed just came down—crushed arm. Spouse took to ER from personal vehicle." *Id.* In the "Reserves" section of the Call-in Sheet, Miller set reserves for Merriam's accident at $7,500 medical, $0 disability, and $50.00 for expenses, noting that Merriam was "in personal vehicle at home." *Id.* Miller reported the information from the Call-in Sheet to Marcy Jordan ("Jordan") and a claim was opened for Merriam's case the same day, August 30, 2005. Gallagher's Material Facts ¶ 29.

In her claim notes for the case, Jordan recounted the information from the Call-in Sheet, stating that "[i]nsured stated he was in his personal car at home," and stating that "[Gallagher] confirmed current coverage for [date of loss] of 3/29/05 under CPP policy ... policy limit max $1,000,000." Gallagher App. at 32. Jordan further noted that the "[c]laim[ ] appears to be a[ ] Non–Occupational claim if Insured was in his own personal vehicle, as he stated."[25] *Id.* On August 30, 2005, Jordan sent Merriam two letters, enclosing several documents—including an Accident Fact Sheet, Medical Claim Form, HIPPA authorization, request for Proof of Loss, and Reimbursement Agreement—for Merriam to fill out and return in order for Gallagher to gather more information about his claim. Gallagher's Material

---

Until this gentleman came to look at my truck and I found out there was insurance." *Id.*

22. The Call–In Sheet states the claim was reported by "self," which would indicate that Merriam himself called in the claim. Justine Merriam, however, testified that she might have made the initial call to Gallagher but could not remember for sure. Justine Merriam Dep. at 66.

23. Justine Merriam testified that 727 Linn Street was a house "we bought and are fixing up [for Timothy Merriam's mother to live in]." *Id.* at 73.

24. Plaintiffs urge that the Call-in Sheet "lists the address of Tim Merriam as 1915 West 1 st Extension. It lists the accident location as Boone, Iowa. The 727 Linn Street appears to have been written by someone with different handwriting than the handwriting with regard to the other information provided."

Pls.' Response to Gallagher's Material Facts ¶ 27. The Court does not believe that the handwriting of the "727 Linn Street" entry is any different from the other writing on the page.

25. The CPP policy does not define "non-occupational." "Occupational," however, is defined as follows:

Occupational means, with respect to an activity, accident, incident, circumstance or condition involving an Insured Person, that it occurs or arises out of or in the course of the Insured Person performing services within the course and scope of contractual obligations to the Contractee. Occupational does not encompass any period of time during the course of everyday travel to and from work.

Landstar's App. at 51. Landstar is the "Contractee" under the terms of the CPP Policy. *Id.* at 47.

Facts ¶ 31. Jordan also sent an inquiry to Bonnie Stewart of Landstar requesting information about Merriam's load and insurance status at the time of the injury. *Id.* ¶ 32. Stewart responded by fax on September 2, 2005, stating only that Merriam was "[t]erminated 03/30/05." *Id.* ¶ 33. Jordan also conducted a tractor history inquiry on Merriam's tractor through the Landstar system on September 2, 2005, which stated that Merriam picked up his load on March 24, 2005 and delivered it in Cedar Rapids on March 28, 2005, the day before Merriam's injury.[26] *Id.* ¶ 34. On September 7, 2005, Jordan called Landstar to confirm the freight billing ticket number provided to Gallagher by Merriam but was informed that the number Merriam provided was a phone number, not a freight billing ticket number. *Id.* ¶ 35. Additionally, Landstar informed Jordan that it had no information regarding an accident for the date of March 29, 2005. *Id.* On September 20, 2005, Jordan requested and obtained an "activity check" of Merriam by First Advantage Investigative Service.[27] *Id.* ¶ 36.

On September 21, 2005, Brenda Cullinan ("Cullinan"), the Branch Manager at Gallagher, made a short entry in the claims notes which stated, "pending medical claim form, non-occupational claim." Gallagher App. at 33. On September 23, 2005, Jordan received from Merriam, by fax, the completed Medical Claim Form, HIPPA Authorization, Reimbursement Agreement, Accident Fact Sheet, and a list of treating doctors. Gallagher's Material Facts ¶ 39. The Accident Fact Sheet,[28] which was filled out in large part by Justine Merriam, stated Plaintiffs' home address as "1915 West 1st Extension, Boone, Iowa," but again stated the location of the accident as "727 Linn St. Boone, Iowa 50036."[29] Gallagher App. at 47. Likewise, the "Medical Claim Form," which was filled out by Justine Merriam, stated that Plaintiffs' home address was "1915 West First Extension," but that the "accident oc-

---

26. Again, there is no real dispute in the record that Merriam's load was delivered after his injuries by another individual, despite documentation provided to Gallagher indicating otherwise.

27. Jordan testified as following with regard to First Investigative Service:
 Q. What prompted you to ask First Advantage Investigative Service to go out and do an activity check?
 A. We probably wanted to see where his accident occurred, and where he is if he said he was at home and he had the accident. It looks like he had given us two different addresses.
 Gallagher App. at 102–03.

28. In response to "how [the accident] happened," Justine Merriam wrote, "operating a dump truck. The bed was stuck in the up position. I reached across the framed the truck with my left arm to trip the 'drop lever' and the bed of the truck came down and pinned me across the shoulder and hit me in the head. Pinned 5–10 minutes." Gallagher App. at 47.

29. Plaintiffs do not deny that the Accident Fact Sheet lists the location of Merriam's accident as "727 Linn Street," but emphasize that Justine Merriam did not write the address. Pls.' Response to Gallagher's Material Facts ¶ 40; *see also* Justine Merriam Dep. at 67 (testifying that the handwriting of both Timothy and Justine Merriam appears on the Accident Fact Sheet). "Justine Merriam testified that her handwriting started on the Accident Fact Sheet ... after the category that states brief summary of how it happened (who was at fault).... Justine believes that the first part [the section with home address and with the "location" of the accident] may have been filled out by Tim Merriam. At the risk of being repetitive, the Plaintiffs would emphasize to the court that Tim Merriam sustained a head injury in this March 29, 2005 occurrence and that since that occurrence 'his memory is absolutely horrible.'" Pls.' Response to Gallagher's Material Facts (internal citations omitted).

cur[ed]" at "727 Linn St. Boone, IA."[30] The Medical Claim Form states that the accident happened when "bed of truck came down on my left arm, shoulder, and hit me in the left side of my head." Gallagher App. at 48. In response to the question, "Is the claim the result of a work related injury?", Plaintiffs checked the "yes" box. *Id.* On the back of the form, however, in an area completed by Merriam's physician, the "no" box is checked in response to the question, "Was this illness or injury work related."[31] *Id.* at 49. On September 27, 2005, Jordan took handwritten notes during a conversation with Merriam. Therein, she notes that the "International [dump truck] is not leased to Landstar . . . own personal vehicle when accident occurred." Gallagher App. at 42. Jordan made an extended entry in the case claim notes on September 29, 2005, stating:

> Insured called 515–432–6868 RE: disability benefits. Insured reported claim on 8/30/05 regarding date of accident of 3/29/05. On 9/26/05 GBS [Gallagher] received the Insured's completed medical claim form signed on 9/22/05 and list of drs name and address for claims processing for disability benefits. Insured stated he has waited a week, he stated he called last week and was told an adjuster would have an answer. I ex-

plained I am the adjuster & just received this information. Insured went over information he reported on 8/30/05 to Carolyn Miller, GBS claims assistant. Today Insured clarified that he was at home in Boone, IA in his driveway, in his own personal vehicle, 1955 international which is a dump truck, which is not leased to Landstar & he clarified that, he went to lower bed, it wouldn't come down, crushed his left arm. Insured also stated he had a Landstar dispatch/load in his other semi, # 544815, which is leased to Landstar, at time of accident, so insured stated he believes he should receive OCCUPATIONAL benefits for injury which occurred while in HIS OWN personal vehicle. I explained under this policy there are NON Occupational benefits, for medical benefits max limit $7,500.00 which may be available for this injury of 3/29/05, but gbs will review all information to make determination. GBS has not received any medical bills nor accident. Insured stated he is very upset, as he stated, he should be able to get disability benefits for this claim, as he paid premiums, for years (5). Insured stated reason he did not call GBS at time of accident was he was not aware of this CPP policy (TRK 9028670) and his own agent had lied to him, as well as

---

**30.** Plaintiffs emphasize that Justine Merriam filled out this form. Pls.' Response to Gallagher's Material Facts ¶ 43. At Justine Merriam's deposition, the following colloquy ensued:

> Q: The other question I had concerning Exhibit 8 is that I noted that the location of the accident was—What was the address there?
> A: It says, "727 Linn Street in Boone."
> Q: Why would that be listed as the location of the accident?
> A: The only thing I can come up with is we had just bought the house, and I had been writing that address on a lot of things. I really don't know. I mean it's

not where it happened. It happened at 1915 West First Extension Street. It didn't happen at 727 Linn.

Justine Merriam Dep. at 73.

**31.** Plaintiffs emphasize that Dr. Mehlhaus, the physician that filled in the Medical Claim Form, had "no understanding whatsoever of the facts and circumstances surrounding the injury, particularly those facts concerning whether Tim Merriam's activities at the time of his injury arose out of and in furtherance of his duties and responsibilities as an over the road trucker, independent contractor for Landstar Ranger." Pls.' Response to Gallagher's Material Facts ¶ 45.

Landstar, and now GBS does not want to pay his claim, which he stated should be paid no matter what if he is dispatched with a load. Insured at one time stated he does have a lawyer, but when I asked for his name, insured stated No I don't know his name. I confirmed GBS received on 9/26/05 indication by insured, on his accident fact sheet "N/A" on Attorney inquiry. Insured stated he does not have attorney at this time.... I confirmed claim will be reviewed for eligibility of benefits under CPP plan. Claim will also be reviewed by Brenda Cullinan, GBS branch manager, and I asked if insured would like to speak to Branch manager at this time, at ext 8883, since Insured stated I had already made up my mind. However, insured "NO", "I do not want to go over this entire claim with someone else." I confirmed claim will be properly review for eligibility of benefits and administered according to policy requirements, provisions, and limitations. I suggested insured put in writing to GBS for clarification, a statement of where in was at time of injury, what insured was doing at time of accident and what happened to insured at time of accident.[32]

Gallagher App. at 32–33.

On October 7, 2005, Jordan made another entry in the claims notes:

9/29/05 GBS called Landstar agent Mike with Glenn & Donna, owner broker agency ... who stated had spoken with Insured sometime after the accident ... and told him he may not have coverage for this accident, as insured was in his own personal vehicle at time of accident. May have led down wrong path. I(GBS) explained under this policy there is Non Occupational benefits which may be available to NON OCC injuries. GBS would review for eligibility of benefits. * * 9/29/05 GBS called insured who stated one of the reasons he had reported this injury to GBS is because he did not know of coverage and thought Social Security benefits would be available for this injury but has been turned down by SS, per insured.[33] To expedite this matter I(GBS) suggested Insured send copies of medical records which he may still have sent to SS for GBS review. Insured stated, he really did not see the point unless he knew for sure he would qualify for TTD [temporary total disability] benefits.

Gallagher App. at 34.

According to the claims notes, on September 30, 2005, Gallagher received a package from Merriam containing medical records and a letter from James Ellis of Landstar stating that Merriam was under load at the time of his injury and that the load in question was picked up by Merriam on March 25, 2005 and delivered by another driver on March 30, 2005. Gallagher App. at 34; Gallagher's Material Facts ¶ 63. On October 3, 2005, Jordan received a driver's log from Merriam stating that on March 29, 2005, at 10:00 a.m., Merriam reached Boone, Iowa and went to "ON DUTY, not driving status." Gallagher's Material Facts ¶ 64. On October 3, 2005, Jordan also received the requested written statement from Plaintiffs detailing what happened on the date of his injury. Galla-

---

**32.** Plaintiffs emphasize that Merriam does not remember his conversations with Jordan and that the claim notes only reflect what Jordan chose to put in them. Pls.' Response to Gallagher's Material Facts ¶¶ 47–57. Plaintiffs also emphasize that the claim notes "do not reflect that Marcy Jordan ever asked Timothy Merriam specifically what he was doing at the time of his injury." *Id.*

**33.** Merriam has, in fact, been granted Social Security disability benefits as a result of his injuries. Pls.' Response to Gallagher's Material Facts ¶ 59.

gher's Material Facts ¶ 770. That written statement provided:

On March 29, 2005, I, Tim Merriam, was under a load from Sparks, Nevada to Cedar Rapids, Iowa. . . . So, I was currently under the load freight bill # JCL # 7457045. I was unable to deliver the load due to my accident, so Mick Ellis (operations manager/dispatcher) of Cedar Rapids, Iowa CED, made arrangements for another driver to pick up the load. . . . On March 29, 2005 approximately between the hours of 10:00 and 11:00 am, I stopped at my house in Boone, Iowa on duty not driving to work on my truck. I went and unloaded a load of gravel with my 1955 International dump truck (old grain truck). I raised and tried to lower the bed of the truck four or five times. The bed would not come down. I reached across the frame of the truck with my left arm, the truck bed slammed down (with a load of gravel still on it) hitting me in the left side of my head splitting it open to the skull and pinning my left arm over the frame of the bed crushing me across the left shoulder and back.

Gallagher App. at 58.

On October 17, 2005, Jordan again spoke to Merriam regarding the circumstances of his accident, specifically about the gravel he was spreading at the time. Gallagher's Material Facts ¶ 74. In handwritten notes of the conversation, Jordan wrote:

Gravel—2 tons—from Gravel Pit in Boone, IA—unloading gravel (at own resident into driveway) "receipt for gravel"—"I guess so" rep Ins.

I asked Mr. Merriam for receipt for Gravel for his own personal use to put on his own driveway. Insured stated—gravel was not a load for anyone for gain.

Mr. Merriam is currently in Hospital for reconstruction of arm.

Gallagher App. at 61. On October 20, 2005, Jordan added to her handwritten notes the following: "Brenda—Please review—If covered. I believe this is only Non–Occ—Med only $7500. However—he has OI—for medical. Brenda—Insured was not performing 'OCC serv for the contractee.' Would there be a 'paralysis benefit' to be considered under Non–OCC? ?" Gallagher App. at 61.

On October 21, 2005, Cullinan sent Jordan an e-mail stating: "This is a non-occupational claim. Benefits would be $7500 medical. If insured is paralyzed as a paraplegic, will need medical records to verify that it is permanent. Maximum benefit would be $15000 for paraplegia." Gallagher's Material Facts ¶ 114. On October 21, 2005, Jordan issued a letter to Merriam conveying Gallagher's decision to pay his claim under the non-occupational provisions of his CPP policy. *Id.* ¶ 115. Merriam called Jordan on October 26, 2005, stating he wanted to go over the reason for the determination that benefits would be non-occupational, rather than occupational. *Id.* ¶ 116. Merriam reiterated to Jordan his belief that, since he was under load at the time of his injury, he should receive occupational benefits. *Id.* ¶ 117. Merriam stated that he would like to appeal the decision, noting that "he stopped at home while under a load in leased semi, and emptied his own personal dump truck (not leased to contractee) with gravel onto his drive-way since he parks his semi there in his driveway." *Id.* ¶ 118. He further stated that he was entitled to occupational benefits if he was under load, regardless of what he was doing at the time of his injury. *Id.* ¶ 119. Jordan informed Merriam that he should inform the Branch Manager, Cullinan, in writing, of the grounds on which he claimed occupational benefits should be awarded, including any relevant facts or quotes from his CPP policy. *Id.* ¶ 120. Merriam never submitted additional written statements to

Cullinan or anybody else from Gallagher regarding his basis for believing his claim should be paid as occupational.[34] *Id.* ¶ 121.

On November 17, 2005, Jordan made an entry in the claim notes requesting that Cullinan review Merriam's claim for paralysis benefits since medical records supported a conclusion that Merriam's left arm had been paralyzed since March 29, 2005. *Id.* ¶ 122. Cullinan responded that no paralysis benefit was payable under the CPP policy because the policy required paralysis in at least two limbs for benefits. *Id.* ¶ 123. Jordan sent Merriam a letter on November 22, 2005, quoting the CPP policy and informing Merriam that he was not entitled to benefits for paralysis to his arm. *Id.* ¶ 124. On January 31, 2006, Justine Merriam called Gallagher and reported she would be sending in medical bills for payment. *Id.* ¶ 125. Plaintiffs eventually made $3,812.83 in reimbursement claims to Gallagher. Gallagher paid these claims under the non-occupational benefits of the CPP policy. *Id.* ¶¶ 125–128.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment has a special place in civil litigation. The device "has proven its usefulness as a means of avoiding full-dress trials in unwinnable cases, thereby freeing courts to utilize scarce judicial resources in more beneficial ways." *Mesnick v. Gen. Elec. Co.,* 950 F.2d 816, 822 (1st Cir.1991). In operation, the role of summary judgment is to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required. *See id.; see also Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50

(1st Cir.1990). "[S]ummary judgment is an extreme remedy, and one which is not to be granted unless the movant has established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances." *Robert Johnson Grain Co. v. Chem. Interchange Co.,* 541 F.2d 207, 209 (8th Cir.1976) (citing *Windsor v. Bethesda Gen. Hosp.,* 523 F.2d 891, 893 n. 5 (8th Cir.1975)). The purpose of the rule is not " 'to cut litigants off from their right of trial by jury if they really have issues to try,' " *Poller v. Columbia Broad. Sys., Inc.,* 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (quoting *Sartor v. Ark. Natural Gas Corp.,* 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)), but to avoid "useless, expensive and time-consuming trials where there is actually no genuine, factual issue remaining to be tried." *Anderson v. Viking Pump Div., Houdaille Indus., Inc.,* 545 F.2d 1127, 1129 (8th Cir.1976) (citing *Lyons v. Board of Educ.,* 523 F.2d 340, 347 (8th Cir.1975)).

The plain language of Federal Rule of Civil Procedure 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The precise standard for granting summary judgment is well-established and oft-repeated: summary judgment is properly granted when the record, viewed in the light most favorable to the nonmoving party and giving that

---

**34.** Plaintiffs deny Defendants' claim that they never appealed the award of non-occupational, rather than occupational benefits, emphasizing that Merriam doesn't understand the CPP policy even today, and that after "the unfounded denial of his claim, Timothy Merriam and his wife Justine sought out legal counsel and eventually filed this lawsuit." Pls.' Response to Gallagher's Material Facts ¶ 121.

party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir.1994). The court does not weigh the evidence nor make credibility determinations, rather the court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Wilson v. Myers*, 823 F.2d 253, 256 (8th Cir.1987) ("Summary judgment is not designed to weed out dubious claims, but to eliminate those claims with no basis in material fact.").

It is the unusual case where the party shouldering the burden of proof prevails on a summary judgment motion. *See Turner v. Ferguson*, 149 F.3d 821, 824 (8th Cir.1998) ("Summary judgments in favor of parties who have the burden of proof are rare, and rightly so.").

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *See Celotex*, 477 U.S. at 323, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Once the moving party has carried its burden, the nonmoving party must go beyond the pleadings and, by affidavits or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is genuine issue for trial. *See* Fed. R.Civ.P. 56(c), (e); *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat a motion for summary judgment; the requirement is that there be no *genuine* issue of

*material* fact." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505 (emphasis in original). An issue is "genuine," if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *See id.* at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material. . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

### III. LAW AND ANALYSIS

#### A. *Landstar's Motion for Summary Judgment*

Plaintiffs assert three claims against Landstar: 1) negligent misrepresentation; 2) fraudulent misrepresentation; and 3) assumed duty under Restatement (Second) of Torts § 323. Landstar moves for summary judgment on all three claims, asserting a variety of theories in support of its motion.

#### 1. *Counts I & II: negligent and fraudulent misrepresentation.*

Count I of Plaintiffs' Amended Complaint asserts that Landstar is liable for negligent misrepresentation. Specifically, Plaintiffs claim that Landstar made the following material misrepresentations to them:

1) In representing to the Merriams that there was no insurance coverage which would compensate them in whole or in part for the serious and permanent injuries sustained by Timothy Merriam as well as the financial losses associated with that injury;

2) In assuming there was no coverage when it lacked the training and education to make such a determination; [and]

3) In making the representation that there was no insurance coverage available when it had not done a complete and adequate investigation with regard to the scope of coverage un-

der the "blanket trucker's occupational accident insurance policy" or the particulars of Timothy Merriam's injury.

Am. Compl., Count I ¶ 16. Plaintiffs' Amended Complaint asserts that Landstar's false representations were "a proximate cause of Plaintiff[s'] delay in formally making a claim under the CPP policy and that 'Plaintiffs later were told by [National Union and Gallagher] that [their] claim was not timely made and ... that fact formed the basis, in whole or in part, for [the denial of Plaintiffs' claim].' " *Id.* ¶ 17.

In Count II of Plaintiffs' Amended Complaint, Plaintiffs allege that Landstar's misrepresentations, as articulated in Count I, "were known to be false at the time they were made or were made with reckless disregard as to their falsity." Am Compl., Count II ¶ 4. Plaintiffs claim that Landstar's false representations "were a proximate cause of Plaintiffs' delay in formally making a claim" under the CPP policy and that the failure to timely file a claim was the basis for the denial of benefits thereunder. *Id.* ¶ 7.

Plaintiffs now concede that their claim for insurance benefits under the CPP policy was *not* denied for being untimely. Indeed, Plaintiffs affirmatively state in their resistance to Landstar's motion for summary judgment, "In light of the admission contained in Defendant's motion for summary judgment that Timothy Merriam's claim under the National Union Blanket Truckers' Occupational Accident Policy was not denied because it was untimely filed, Plaintiffs are withdrawing that component of their negligent and/or fraudulent misrepresentation claim." Pls.' Resistance Br. at 1. Interestingly, the only assertion

of harm in Plaintiffs' Amended Complaint is the allegation that Landstar's misrepresentations caused Plaintiffs' claims to be denied as untimely. Nonetheless, Plaintiffs now claim in resistance to Landstar's Motion for Summary Judgment that, "In essence, Plaintiffs claims against Landstar [ ] focus on the fact that Landstar [ ] assumed the duty of advising truckers of their need for certain types of insurance coverage but failed to educate those truckers as to which type of policy would provide the trucker with the best protection from injury that might occur in conjunction with his self-employed trucking enterprise." Pls.' Resistance Br. at 1. Landstar, likewise, contends that Plaintiffs' Amended Complaint alleges that: 1) "representatives of Landstar made and/or failed to make several representations which caused [Plaintiffs'] injury"; 2) "Landstar failed to advise [Merriam] about the limits of coverage under the CPP policy"; and 3) "Landstar failed to advise [Merriam] that he should obtain workers' compensation coverage in addition to or in lieu of the CPP policy." Landstar's Br. at 8. While the Court does not believe that Plaintiffs have properly alleged any of the matters referenced above as a basis for their negligent or fraudulent misrepresentation claims against Landstar,[35] the Court will nonetheless address the merits of Plaintiffs' arguments in this regard.

The Iowa Supreme Court has identified the following factors as requisites to success on a claim of negligent misrepresentation:

 The elements for the tort of negligent misrepresentation are:

(1) One who, in the course of his business, profession or employment, or

---

35. The failure to properly plead any cognizable harm (other than the now defunct claim that Landstar's misrepresentations caused Plaintiffs' claims to be denied as untimely) arising from Landstar's alleged misrepresentation is, alone, sufficient to warrant summary judgment in favor of Landstar on Counts One and Two of the Amended Complaint.

in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) ... [T]he liability stated in Subsection (1) is limited to loss suffered

(a) by the person ... for whose benefit and guidance he intends to supply the information ...; and

(b) through reliance upon it in a transaction that he intends the information to influence....

*Barske v. Rockwell Int'l Corp.*, 514 N.W.2d 917, 924 (Iowa 1994); *see* Iowa Civil Jury Inst. 800.1 ("Negligent Misrepresentation—Where no public duty to give information exists—Essentials for Recovery").

■ The elements for the tort of fraudulent misrepresentation are similar in many regards to the elements of negligent misrepresentation. A plaintiff seeking to hold a defendant liable for fraudulent misrepresentation must demonstrate: 1) a representation; 2) that the representation was false; 3) that the representation was material; 4) that the defendant knew the representation was false; 5) that the defendant intended to deceive the plaintiff; 6) that the plaintiff justifiably relied on the representation; and 7) that the representation was a proximate cause of plaintiff's damage. *Smidt v. Porter*, 695 N.W.2d 9, 22 (Iowa 2005); *see also* Iowa Civil Jury Instr. 810.1.

a. *Negligent misrepresentation: Did the Defendant owe a duty of care?*

"As with all negligence actions, an essential element of negligent misrepresen-

tation is that the defendant must owe a duty of care to the plaintiff.... [T]his means the person who supplies the information must owe a duty to the person to whom the information is provided." *Sain v. Cedar Rapids Comm. Sch. Dist.*, 626 N.W.2d 115, 124 (Iowa 2001) (holding that the defendant must "be in the business or profession of supplying information for the guidance of others" to sustain negligent misrepresentation claim); *see also Jensen v. Sattler*, 696 N.W.2d 582, 588 (Iowa 2005) ("Absent a special relationship giving rise to a duty of care, a [claimant] cannot establish negligent misrepresentation."). The Iowa Supreme Court has "determined that this duty arises only when the information is provided by persons in the business or profession of supplying information to others." *Id.* (citing *Hendricks v. Great Plains Supply Co.*, 609 N.W.2d 486, 492 (Iowa 2000)). Thus, in determining whether a duty of care arises in this case, the Court must "distinguish between those transactions where a defendant is in the business or profession of supplying information to others from those transactions that are arm's length and adversarial." *Id.* (citing *Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 227 (Iowa 1998)). "The facts to support the tort ... have traditionally arisen only in the context of commercial transactions." *Id.* at 125.

■ The Court determines whether Landstar was in the business or profession of supplying information to others as a matter of law. *Fry v. Mount*, 554 N.W.2d 263, 265 (Iowa 1996). In so doing, the Court evaluates several factors: 1) whether there is a "special relationship" between Landstar and Merriam;[36] 2) whether Landstar was acting in an advisory capacity such that it should have been manifestly

---

36. Plaintiffs filed a supplemental brief in sup- port of their resistance to Landstar's Motion

aware of the use to which Merriam would put the information, and whether Landstar intended to supply the information for that purpose; 3) whether Landstar had a pecuniary interest; and 4) whether Landstar supplied insurance information to Merriam gratuitously or incident to other more central functions or services. *Sain*, 626 N.W.2d at 124.

■ Plaintiffs admit that they must demonstrate that Landstar was in the business or profession of supplying information to sustain their negligent misrepresentation claim. Pls.' Resistance Br. at 15. To support such a finding, Plaintiffs argue that Landstar "is in the business of re-cruiting self-employed over the road truck drivers to lease out to it as independent contractors" and that Landstar "has an entire qualification process set up with multiple qualification centers throughout the country." *Id.* at 16. Plaintiffs further state that, as part of this process, it was Elder's "job to provide information either in person, through the mail or through fax which would allow a self-employed over the road trucker to successfully go through the qualification process." *Id.* In so doing, Elder provided a packet of information, which included a one-page acceptance form and a promotional flyer concerning CPP, making it "convenient and easy" to obtain CPP coverage.[37] *Id.* at 16–

for Summary Judgment alleging that Landstar assumed a duty to properly advise Merriam about insurance issues because of special statutory duties that arise from the fact that Merriam and Landstar's Contract was governed by the Federal Motor Carrier Safety Regulations. Specifically, Plaintiffs claim that Merriam was a "statutory employee" under the regulations and that Landstar, therefore, had "an absolute duty to advise Timothy Merriam of his need for workers' compensation coverage [due to] the fact that under the Iowa workers' compensation laws, if Timothy Merriam is deemed to be an employee, his right to workers' compensation benefits for an injury that arises out of and in the course of his employment is his exclusive remedy." Pls.' Supp. Br. at 4. Plaintiffs cite 49 C.F.R. § 376.12(c)(1) and § 383.5 of the Federal Motor Carrier Safety Administration Regulations in support of their contention that Merriam is a "statutory employee."

As noted previously, Plaintiffs' entire Amended Complaint asserted liability against Landstar *exclusively* on the basis that Landstar improperly advised Plaintiffs about whether Merriam had any insurance coverage that would provide benefits for his injuries, thus causing Plaintiffs to have their claim under the CPP policy denied as untimely. Despite these limited allegations and the fact that Plaintiffs' claim was *not*, in fact, denied as untimely, Plaintiffs nonetheless asserted alternate factual theories of liability against Landstar in their Resistance to Landstar's Motion for Summary Judgment. The Court has addressed these issues on their merits, despite the impropriety of raising novel and previously unpled grounds for recovery for the first time in a resistance to a motion for summary judgment. Plaintiffs' attempts to inject yet another previously unpled factual basis for Landstar's liability simply goes too far; it is entirely improper, and indeed, comes precariously close to being sanctionable. Accordingly, the Court declines to entertain Plaintiffs' theory that he is a "statutory employee" of Landstar, particularly in light of the Court's findings, *infra*, that Plaintiffs' claims of negligent and fraudulent misrepresentation would fail for want of proximate causation or justifiable reliance, even if Landstar owed Merriam a duty of care.

37. Plaintiffs argue: "[T]he vast majority of others going through the [qualification] process (in 2005, 7,399 out of 8,644 truckers going through the qualification process opted for the CPP coverage, and it can only be assumed, consistent with Landstar Ranger Independent Contractor Agreement that those that did not opt for CPP coverage may not have qualified for [it] because of the size of their fleet or the number of drivers)." Pls.' Resistance Br. at 17. Plaintiffs' comments in this regard are entirely gratuitous. First, the Court notes that Plaintiffs highlight *Greatbatch v. Metropolitan Federal Bank*, 534 N.W.2d 115, 116 (Iowa Ct.App.1995), as requiring the Court to determine whether a defendant is in the business of supplying information "after considering the facts that exist in connection with the interaction be-

17. Furthermore, Plaintiffs contend that, "in conjunction with the qualification process, Landstar Ranger had its own insurance department within its corporate headquarters in Jacksonville, Florida where all insurance inquiries were directed" and thus, had "set up a structure to provide information on insurance." *Id.* at 17. In summary, Plaintiffs argue:

> Landstar provides the information to truckers who are considering an affiliation with Landstar [ ] so as to make it easy for them to become an independent contractor.... The more such independent contractors it has on the roadway, the more money Landstar [ ] makes. In this context, its trucking independent contractors on the road are consistently exposed to the risk of injury or death. Workers' compensation insurance coverage or some form of insurance coverage to protect that trucker and his family in the event of such a catastrophic injury or loss should be paramount in the discussions. Landstar is clearly in the business of supplying information about what is necessary to become qualified as an independent contractor.... Part of that information involves insurance coverages that are required. Because it has a department whose job is to respond to questions about those insurance coverages, Landstar's argument that it's not in the business of supplying information must fail.

Pls.' Resistance Br. at 18.

The Court finds Plaintiffs' argument to be without merit. First, there was no special relationship between Landstar and Merriam. Indeed, the relationship between the two was a typical arms-length transaction, i.e., Merriam sought to "lease out" to Landstar as a self-employed over the road truck driver and Landstar sought to have Merriam work on its behalf in that capacity. Indeed, as Plaintiffs themselves point out, Landstar "is in the business of recruiting self-employed over the road truck drivers to lease out to it as independent contractors." Pls.' Resistance Br. at 16. It is not "in the business" of selling insurance products or of providing information about insurance products. Indeed, paragraph 14 of the contract between Landstar and Merriam explicitly provides that "[t]he responsibilities and obligations between CARRIER and INDEPENDENT CONTRACTOR involving insurance will be specified in *Appendix B*. CARRIER will have no insurance responsibilities or obligations pertaining to INDEPENDENT CONTRACTOR or the Equipment other than those expressly stated in this Agreement or mandated by Applicable Law." Landstar's App. at 11. Appendix B provides in Paragraph 7 that "INDEPENDENT CONTRACTOR recognizes and agrees that CARRIER is not in the business of selling or soliciting insurance, and any insurance coverage requested by INDEPENDENT CONTRACTOR or provided through CARRIER is subject to all the terms, conditions and exclusions of the actual policy issued by the insurance underwriter." *Id.* at 22.

---

tween the two parties." Pls.' Resistance Br. at 16. Indeed, *Greatbatch* highlights the need for a "case-specific inquiry ... to determine whether a particular business or enterprise is in the business of supplying information to guide others in their business transactions." 534 N.W.2d at 117. The fact, however, that a great many truckers who contracted with Landstar obtained CPP coverage really sheds no light on the inquiry into the nature of Landstar's business whatsoever. In fact, the record does not reflect that other truckers who obtained CPP coverage *only* purchased CPP coverage. Indeed, the other truckers may well have purchased CPP coverage *in addition* to traditional workers' compensation coverage. Additionally, Plaintiffs' "assumption" that those that didn't opt for CPP must have been somehow ineligible for CPP coverage is entirely without record support.

Second, Landstar was not acting in an advisory capacity when it provided a flier and a sign-up form for CPP coverage to Merriam. The terms of the contract between Landstar and Merriam clearly set out that, prior to working as an independent contractor for Landstar, an independent contractor had to provide an insurance certificate showing that the independent contractor had procured either workers' compensation insurance or "occupational accident insurance" that met certain requirements set out in the Contract. *Id.* at 20. If the independent contractor met certain requirements, then he could obtain a CPP plan "[i]n lieu of obtaining the required workers' compensation or occupational accident insurance." *Id.* The Court can find nothing in the record to indicate that, by providing a flier about CPP coverage, that Landstar was somehow "advising" potential independent contractors to take that coverage instead of traditional workers' compensation coverage. While certainly Landstar might have been "manifestly aware" that Merriam would consider the CPP coverage, the record is absolutely devoid of any indication that Landstar should have been aware that Merriam, an independent, self-employed, and experienced truck driver, would blindly choose that coverage without consideration or inquiry into the extent of benefits thereunder, or without consideration of other types of insurance specifically mentioned in the Contract. Moreover, the record evidence leads to a conclusion only that Landstar intended to provide information about CPP coverage as a convenience to potential independent contractors, not that it supplied the information with the intent to get independent contractors to purchase the CPP coverage instead of other coverage types available.

Third, while it may be true that "[t]he more ... independent contractors [Landstar] has on the roadway, the more money [it] makes," Pls.' Resistance Br. at 18, the Court does not believe that such a tangential pecuniary interest is sufficient to sustain a finding that Landstar is in the business of providing information. The Restatement (Second) of Torts § 552 provides that a "defendant's pecuniary interest in supplying the information will normally lie in a consideration paid to him for it or paid in a transaction in the course of and as a part of which it is supplied." Here, there is no evidence that Landstar received any compensation from National Union for selling CPP policies, or that it otherwise profited in any fashion when independent contractors chose CPP coverage instead of traditional workers' compensation coverage. While the Restatement recognizes that pecuniary gain may arise from transactions "of a more indirect character," *see id.,* Landstar would profit from additional independent contractors regardless of whether such contractors ultimately chose CPP or some other type of insurance coverage.

Finally, since Landstar was a trucking company engaged in the business of "recruiting self-employed over the road truck drivers to lease out to it as independent contractors," Pls.' Resistance Br. at 16, the flier and sign-up sheet it provided related to CPP coverage were gratuitously provided to Merriam. Even if Landstar provided the flier and sign-up sheet "in the course of [its] business, profession or employment," such a fact is not conclusive evidence that it was in the business of providing such information. Restatement (Second) of Torts § 552. Indeed, "when one who is engaged in a business or profession steps entirely outside of it, as when an attorney gives a casual and offhand opinion on a point of law to a friend whom he meets on the street, or what is commonly called a 'curbstone opinion,' it is not to be regarded as given in the course of his

business or profession; and since he has no other interest in it, it is considered purely gratuitous." *Id.* Here, the information provided about CPP coverage is entirely incidental to the more central function or service provided by Landstar, that is, engaging independent contractors to "lease out" to Landstar. *See id.* (stating that the recipient of such gratuitously provided information is "not justified in expecting that his informant will exercise the care and skill that is necessary to insure a correct opinion and is only justified in expecting that the opinion will be an honest one"[38]).

For these reasons, the Court concludes that Landstar was not "in the business" of supplying information about CPP insurance or any other type of insurance coverage for Merriam's guidance. Indeed, the record facts regarding the relationship between the parties indicates a normal, arms-length transaction that was adversarial, not advisory in nature. Accordingly, Landstar owed no duty of care to Merriam and, therefore, cannot be held liable for negligent misrepresentation.

b. *Negligent and Fraudulent Misrepresentation: Did Plaintiffs justifiably rely on Landstar's representations?*

Plaintiffs' claims of negligent and fraudulent misrepresentation both require Plaintiffs to demonstrate that they "justifiably relied" on Landstar's representations regarding insurance coverage. *See Pollmann v. Belle Plaine Livestock Auction, Inc.,* 567 N.W.2d 405, 409–10 (Iowa 1997) ("The tort of negligent misrepresentation requires proof that the plaintiff justifiably relied on the representation made by the defendant."); *Midwest Home Distributor, Inc. v. Domco Indus.,* 585 N.W.2d 735, 743 (Iowa 1998) ("[J]ustifiable reliance is an essential element of fraudulent misrepresentation."). " 'Reliance upon [a defendant's representation] is justifiable if a person acting with reasonable and ordinary prudence and caution would have a right to rely on the representations.' " *Pollmann,* 567 N.W.2d at 410 (quoting *Kaiser Agric. Chems. v. Ottumwa Prod. Credit Ass'n,* 428 N.W.2d 681, 683 (Iowa Ct.App.1988)).

In the present case, Plaintiffs argue that they justifiably relied on Landstar to fully apprise Merriam of the risks and benefits of the various types of insurance that would satisfy the insurance requirements under the Contract. Plaintiffs emphasize: 1) that Merriam had absolutely no experience with insurance prior to leasing out to Landstar; 2) that Landstar made it "convenient and easy" to satisfy its insurance requirements by accepting the CPP coverage and did not provide similar information about other types of coverage that would satisfy the Contract requirements; and 3) that Landstar "had an insurance department to clarify any questions" truckers might have about insurance coverage. Pls.' Resistance Br. at 11–13. Plaintiffs summarily conclude that "Tim Merriam is a high school educated individual. He relied reasonably on Landstar to effectively get him through the qualification process and be straight up with him with regard to insurance coverages that he needed to adequately protect himself and his family in the event of catastrophic injury." *Id.* at 15.

Having carefully considered Plaintiffs' arguments in this regard, the Court nonetheless must conclude that Plaintiffs were not justified in their reliance on Landstar to provide detailed information about the advantages and disadvantages of various

---

**38.** Notably, there is no allegation in this case that Landstar *lied* in any of its representations to Plaintiffs, only that it did not fully inform Merriam of the various types of insurance options available to him.

types of insurance coverages. "Reliance is not justified if the person receiving the information knows or in the exercise of ordinary care should know that the information is false." [39] *Pollmann,* 567 N.W.2d at 410. In the present case, Plaintiffs were in possession of a wealth of information that put them on notice not only that insurance coverage would be determined by the policy itself, and not by Landstar, but also that there were important differences between workers' compensation coverage and CPP insurance coverage.

The terms of the Contract between Merriam and Landstar explicitly informed Plaintiffs that Landstar "is not in the business of selling insurance," and that "any insurance coverage ... is subject to all the terms, conditions and exclusions of the actual policy issued by the insurance underwriter." Landstar App. at 21–22. To say that Plaintiffs were entitled to rely on the assertions of a contract trucking company to provide information about what type of insurance an individual trucker should choose is patently unreasonable, particularly in the face of this explicit language to the contrary. Moreover, Plaintiffs received a letter from Gallagher after the CPP policy was issued which stated, "It is important for you to note the occupational accident insurance policy you have purchased does NOT provide workers' compensation coverage.... You should take the time to carefully review the policy to become familiar with all the terms, conditions and exclusions...." Landstar's App. at 38. Indeed, the letter even provided a phone number that Plaintiffs could call for an explanation of any terms, conditions, or exclusions they did not understand. *Id.*

Despite all of these plainly worded provisions putting Plaintiffs on notice that CPP coverage was not akin to workers' compensation insurance, Plaintiffs nonetheless insist that none of these provisions matter because "it is undisputed in this record that a copy of the policy was never provided to Timothy Merriam until after he sustained his March 29, 2005 injury." Pls.' Resistance Br. at 14. This argument is without merit, however, because while the policy was not provided to him, Gallagher's January 2, 2004 letter to Merriam explicitly informed him how he could obtain a full copy of the policy, "either via the Internet or by contacting the Gallagher Insurance Coordinator at Gallagher Transportation: 800–279–7500." Landstar's App. at 38. Plaintiffs, however, never made any effort to obtain the policy, despite recommendations by Gallagher that they become familiar with the terms, conditions, and exclusions of the Policy. *See id.*

Plaintiffs further argue that no terms in the Contract can operate to undermine Plaintiffs' "justifiable reliance" on Landstar's information, or lack thereof, because the "factual record clearly demonstrates that there is a dispute as to whether Timothy Merriam ever read the Independent Contractor Agreement or whether he would have been able to understand its terms and conditions." Pls.' Resistance Br. at 13–14. In support of this position, Plaintiffs cite *C & J Fertilizer v. Allied Mutual Insurance Co.* for the proposition

---

**39.** Though Iowa law is not clear on this point, the Court will, for purposes of the present motion, presume that an allegation of omission is akin to an allegation of affirmatively providing false information. *Compare Breeden v. Richmond Comm. Coll.,* 171 F.R.D. 189, 194 (M.D.N.C.1997) (finding that "concealment or nondisclosure may be considered akin to a positive misrepresentation") *with Sergeant Oil & Gas Co., Inc. v. Nat'l Maintenance,* 861 F.Supp. 1351, 1360 (S.D.Tex. 1994) (finding no "supplying" of false information sufficient to support a negligent misrepresentation claim where the allegation was simply one that material information was not disclosed).

that, "It is generally recognized the insured will not read the detailed, cross-referenced, standardized mass-produced insurance form, nor understand it if he does." *Id.* at 14–15 (citing *C & J Fertilizer*, 227 N.W.2d 169, 174 (Iowa 1975)).

In *C & J Fertilizer*, the owner of a fertilizer factory sought to recover for burglary loss under two separate insurance policies. 227 N.W.2d at 171. The insurance company denied coverage on the basis that there were no visible marks or physical damage to the exterior of the plant, citing a provision of the policy defining "burglary" as requiring "visible marks made by tools, . . . or physical damage to, the exterior of the premises at the place of such entry." *Id.* The Iowa Supreme Court found that, despite the policy language in the adhesion insurance contract, the plaintiff was entitled to coverage under the doctrine of reasonable expectations because the definition of burglary in the policy comported "neither with the concept a layman might have of that crime, nor with a legal interpretation." *Id.* at 176–77 (defining the doctrine of reasonable expectations as follows: "The objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations." (citations omitted)).

The present case is plainly distinguishable from *C & J Fertilizer*. First, *C & J Fertilizer* was explicitly decided on the basis of the doctrine of reasonable expectations, a doctrine first formally adopted by the Iowa Supreme in *Rodman v. State Farm Mutual Ins. Co.*, 208 N.W.2d 903, 905–08 (Iowa 1973). In *Rodman*, however, the Iowa Supreme Court explicitly declined to extend the doctrine of reasonable expectations to "cases where an ordinary layman would not misunderstand his coverage from a reading of the policy and

where there are no circumstances attributable to the insurer which foster coverage expectations." *Rodman*, 208 N.W.2d at 906. Indeed, the doctrine of reasonable expectations is designed "as an aid in interpreting a policy, not as a means of avoiding its clear language." *Id.* at 907. Thus, it is clear that the doctrine was not designed to supplant traditional and well-settled jurisprudence holding:

> Failure to read a contract before signing it will not, as a rule, affect its binding force. Indeed, the courts appear to be unanimous in holding that a person who, having the capacity and an opportunity to read a contract, is not misled as to its contents and who sustains no confidential relationship to the other party cannot avoid the contract on the ground of mistake if he signs it without reading it, at least in the absence of special circumstances excusing his failure to read it.

*Bryant v. Am. Express Fin. Advisors, Inc.*, 595 N.W.2d 482, 486–87 (Iowa 1999); *see also Morgan v. Am. Family Mut. Ins. Co.*, 534 N.W.2d 92, 99 (Iowa 1995) ("A party is charged with notice of the terms and conditions in a contract he or she entered into if the party is able to read the contract and has the opportunity to read it."), *rev'd on other grounds, Hamm v. Allied Mut. Ins. Co.*, 612 N.W.2d 775 (Iowa 2000); *Preston v. Howell*, 219 Iowa 230, 257 N.W. 415, 418 (Iowa 1934) ("It is also the settled rule of law that if a party to a contract is able to read, has the opportunity to do so, and fails to read the contract, he cannot thereafter be heard to say that he was ignorant of its terms and conditions, for the purpose of relieving himself from its obligation."); *Advance Elevator Co., Inc. v. Four State Supply Co.*, 572 N.W.2d 186, 188 (Iowa Ct.App. 1997) ("Generally, an agreement in writing speaks for itself and absent fraud or mistake, ignorance of the contents will not serve to negate or avoid its contents. Fur-

ther a party is charged with notice of the terms and conditions of a contract if the party is able or has had the opportunity to read the agreement. A party is also bound by a document the party signs even though the party has not expressly accepted all of the contract provisions and is not aware of them. A party cannot avoid the terms of the contract simply because a harsh result may occur from the failure to read the contract."). On the present facts, as in *Rodman*, Merriam "does not contend he misunderstood the policy. He did not read it. He [ ] asserts [ ] that if he had read it he would not have understood it." *Id.* at 906. This is insufficient to relieve Merriam of his acknowledgment, by virtue of signing and entering the Contract with Landstar, that Landstar had "no insurance responsibilities or obligations pertaining to [Merriam] other than those expressly stated in [the Contract] or mandated by Applicable Law," and that Landstar "is not in the business of selling or soliciting insurance, and any insurance coverage requested by [Merriam] or provided through [Landstar] is subject to all the terms, conditions and exclusions of the actual policy issued by the insurance underwriter." Landstar's App. at 11, 22.

Finally, Plaintiffs' argument that they justifiably relied on Landstar because Landstar had "an insurance department to clarify any questions or concerns that truckers considering the qualification process might have about the scope of that insurance coverage or Landstar's insurance requirements" is without merit. Pls.' Resistance Br. at 13. The only record support Plaintiffs offer for their assertion that Landstar had its "own insurance department" is Elder's speculative and equivocal testimony that, if truckers had questions about insurance coverage, he would "refer them on down to—to Jacksonville, Florida to the home office to . . . a person down there. We had a contact that handled the CPP and they would work with

them, either explain more to 'em about the CPP or other options." Pls.' Additional Facts ¶ 9. Elder further testified that he thought that the "contact," Cindy Chambers, was "actually affiliated with Gallagher but had an office at Landstar." Pls.' App. at 29. However, when Elder was specifically asked whether Chambers had an office at Landstar, Elder stated: "That I . . . couldn't know for sure. I mean . . . all we had was her number and we was told if we had—anybody had questions that we referred them down to her." Elder Dep. at 25–26. Elder clearly had no firsthand knowledge of whether Chambers maintained an office at Landstar or somewhere else, and thus, no reasonable jury could rely on his testimony to reach a conclusion that Landstar, did in fact, maintain its "own insurance department." Moreover, and more importantly, Elder's testimony about an "insurance department" took place long after Merriam's injury and the subsequent denial of occupational benefits. The record reflects that Plaintiffs neither sought nor possessed any information whatsoever on the topic at the time Merriam elected to obtain the CPP policy, thus leaving any claim of reliance, justifiable or otherwise, entirely unsupported.

c. *Negligent and Fraudulent Misrepresentation: Was Landstar the proximate cause of Plaintiffs' damages?*

■ Even assuming that Plaintiffs could demonstrate that Landstar was "in the business" of providing information and that they justifiably relied on representations made by Landstar with regard to insurance coverage as required by the Contract, Plaintiffs claims of negligent and fraudulent misrepresentation would nonetheless fail because Plaintiffs cannot show that Landstar was the proximate cause of Plaintiffs' damages. *See Sain*, 626 N.W.2d at 127 (finding that proximate cause is

necessary element for a claim of negligent misrepresentation); *Smidt*, 695 N.W.2d at 22 (finding that proximate cause is necessary element for claim of fraudulent misrepresentation).

■ To generate a genuine issue of material fact on either misrepresentation claim, Plaintiffs must show evidence that Landstar's alleged misrepresentations were a proximate cause of their damages. Proximate cause includes two components: " '1) the defendant's conduct must have *in fact caused* the plaintiff's damages (generally a factual inquiry) and (2) the policy of the law must require the defendant to be *legally responsible* for the injury (generally a legal question).' " *Berte v. Bode*, 692 N.W.2d 368, 372 (Iowa 2005) (quoting *Gerst v. Marshall*, 549 N.W.2d 810, 815 (Iowa 1996)). Thus, Iowa courts evaluate causation using a two prong approach. That is, Plaintiffs must demonstrate that: 1) "but for the defendant's conduct, the harm would not have occurred"; and 2) the defendant's actions were a "substantial factor" in producing the harm Plaintiffs suffered. *Sumpter v. City of Moulton*, 519 N.W.2d 427, 434 (Iowa Ct.App.1994).

Landstar argues that it is not the proximate cause of Plaintiffs' damages because, regardless of what Landstar did or did not do, did or did not state, or did or did not explain to Merriam, his claims were denied on the merits of the policy language, i.e., it was National Union and Gallagher that made the decision to deny Merriam's claim under the "occupational benefits" provision of his CPP policy and to pay only under the "non-occupational benefits" provision. Landstar's Br. at 5. Plaintiffs counter that Landstar's argument in this regard fails because Merriam's injuries "would have qualified him for benefits under a self-employed workers' compensation policy." Pls.' Resistance Br. at 10. Thus, Plaintiffs claim that since Landstar failed in its alleged duty to advise Merriam of the need

for such insurance, it "clearly exposed Timothy Merriam to a situation where he had no source of compensation for his catastrophic injury." *Id.* at 10.

The Court finds Plaintiffs' argument unconvincing. Even if Landstar had a duty to advise Merriam of all relevant information regarding CPP insurance versus workers' compensation insurance, and even if Landstar did so, Merriam still might have elected to purchase CPP insurance rather than workers' compensation insurance. Thus, the Court cannot say that any reasonable jury could conclude that "but for" Landstar's failure to provide full information, Plaintiffs would not have incurred the damages they claim. *See Reed v. Chrysler Corp.*, 494 N.W.2d 224, 231 (Iowa 1992) ("Conduct that, in natural and continuous sequence, *unbroken by* any efficient intervening cause, produces the result complained of and *without which the result would not have occurred,* is a proximate cause of the event.") (emphasis added). Moreover, even if Merriam had workers' compensation insurance, the insurance carrier in that situation still could have determined that he was not entitled to occupational benefits, regardless of whether such a determination would have been reasonable or unreasonable on the facts of this case. In any event, Landstar played no role in deciding whether Merriam was or was not entitled to benefits under his CPP insurance policy, and neither would it have played a role in deciding whether Merriam would or would not be entitled to benefits under any other type of insurance policy. Indeed, it is important to recognize that if Gallagher and National Union had determined that Merriam's injury was occupational, Plaintiffs would have had ample insurance coverage for Merriam's injuries. Thus, Landstar's actions were not a "substantial factor" in bringing about Plaintiffs' harm.

2. *Count III: Assumed duty under Restatement (Second) of Torts § 323*

■ Plaintiffs third and final cause of action against Landstar alleges that Landstar, by virtue of providing and procuring CPP policies for truck drivers that lease out to it, maintains an obligation to understand the limitations of the coverage under such policies and to appropriately advise truck drivers of their need to procure workers' compensation insurance. Am. Comp. ¶ 4–5. Plaintiffs argue that they reasonably relied on Landstar to fulfill this assumed duty, and that Landstar's failure caused Plaintiffs to suffer damages.

■ The Restatement (Second) of Torts § 323 provides:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of such harm, or

(b) the harm is suffered because of the other's reliance upon the undertaking.

Iowa courts have explicitly adopted § 323 as a basis for liability under Iowa law. *See Am. State Bank v. Enabnit*, 471 N.W.2d 829, 832 (Iowa 1991) ("We have applied Restatement § 323, or cited it with approval, a number of times."). The plain language of § 323 makes clear that a defendant can only be held liable thereunder if his failure to exercise reasonable care causes *physical harm* to another person who relies upon the defendant's undertaking. The Iowa Supreme Court has emphasized this requirement of physical harm as being a prerequisite for liability. *See Theisen v. Covenant Med. Ctr., Inc.*, 636 N.W.2d 74, 82 (Iowa 2001) (concluding that a defendant was not liable under § 323 because the plaintiff "did not suffer any

physical harm"); *see also Shaner v. United States*, 976 F.2d 990, 994 (6th Cir.1992) (holding that "[r]ecovery under the Good Samaritan Doctrine [§ 323] is limited to physical harm"); *Ass'n of Washington Pub. Hosp. Dists. v. Philip Morris Inc.*, 79 F.Supp.2d 1219, 1228 (W.D.Wash.1999) ("[A] claim of breach of a special duty requires 'physical harm' to plaintiffs."); *Caldwell v. City of Philadelphia*, 358 Pa.Super. 406, 517 A.2d 1296, 1306 (1986) (finding that § 323, "by its terms, applies only to liability for physical harm"); *King v. Graham Holding Co., Inc.*, 762 S.W.2d 296, 300 (Tex.App.1988) ("[S]ection 323, by its own terms, applies only to physical harm which was not alleged by appellants.").

While Merriam clearly suffered physical harm when the bed of his dump truck fell on him, that harm would have occurred regardless of whether or not he was insured, and whether or not he was insured by a workers' compensation policy or a CPP policy. Thus, Merriam would have sustained his physical injuries regardless of any action or inaction by Landstar. Indeed, Plaintiffs are not suing Landstar for Merriam's physical injuries, but rather for economic injuries he has suffered as a result of the denial of his claim as an occupational benefit under the CPP policy. Plaintiffs attempt to sidestep this lack of physical harm by claiming that Landstar may nonetheless be liable because "[t]here is an obvious nexus between Landstar['s] failure to exercise reasonable care in providing [information] to Timothy Merriam and his resulting injury." Pls.' Resistance Br. at 20. "Stated another way, had Landstar [ ] exercised reasonable care such that Timothy Merriam understood which of those policies provided him with the greatest level of protection in the event of an occupational injury, he would not have been left in the posture of having sustained an occupational injury without

any form of compensation to protect he or his family." *Id.* Plaintiffs offer absolutely no legal support for their novel interpretation of § 323, and this Court declines to depart from the plain language of § 323 providing that liability may be had only for "physical harm." Accordingly, summary judgment in favor of Landstar is proper on Plaintiffs' claim under Restatement (Second) of Torts § 323.

B. *Plaintiffs' Motion for Summary Judgment on Count V and National Union's and Gallagher's Cross-Motion for Summary Judgment on Count V*

In Count V of Plaintiffs' Amended Complaint, Plaintiffs assert that Defendants National Union and Gallagher (collectively referred to as "Gallagher" or "Defendants" throughout this section) are liable for "Insurance Bad Faith." *See* Am. Compl. Plaintiffs have filed a Motion for Summary Judgment (Clerk's No. 40) with regard to Count V, and Gallagher has filed a cross-Motion for Summary Judgment with respect to Count V (Clerk's No. 55).

1. *Additional considerations for cross-motions for summary judgment.*

In the presence of competing cross motions for summary judgment, the Court must keep in mind that summary judgment is not a paper trial. Accordingly, a "district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir.1994). In a motion for summary judgment this Court has but one task, to decide, based on the evidence of record as identified in the parties' moving and resistance papers, whether there is any material dispute of fact that requires a trial. *See id.* (citing *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505 and 10 Charles A. Wright & Arthur R. Miller, *Federal Practice and*

*Procedure* § 2712 (3d ed.1998)). The parties then share the burden of identifying the evidence that will facilitate this assessment. *Waldridge*, 24 F.3d at 921.

Neither does filing cross motions for summary judgment mean the parties have waived their right to trial. *See Wermager v. Cormorant Township Bd.*, 716 F.2d 1211, 1214 (8th Cir.1983) ("[T]he filing of cross motions for summary judgment does not necessarily indicate that there is no dispute as to a material fact, or have the effect of submitting the cause to a plenary determination on the merits.") (citations omitted). Rather, for the purposes of summary judgment, a party concedes there are no factual issues and accepts the other party's allegations only for the purpose of their own motion. *See Federal Practice and Procedure* § 2720; *see also Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558, 561–62 (7th Cir.2002) (reviewing the record with "all inferences in favor of the party against whom the motion under consideration is made") (citing *Hendricks–Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir.1998)). "Cross motions simply require [a court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Barnes v. Fleet Nat'l Bank*, 370 F.3d 164, 170 (1st Cir.2004) (quoting *Wightman v. Springfield Terminal Ry.*, 100 F.3d 228, 230 (1st Cir.1996)). In this matter, then, each motion will be "evaluated independently to determine whether there exists a genuine dispute of material fact and whether the movant is entitled to judgment as a matter of law." *St. Luke's Methodist Hosp. v. Thompson*, 182 F.Supp.2d 765, 769 (N.D.Iowa 2001). As noted previously, however, the Court is mindful that "[s]ummary judgments in favor of parties who have the burden of proof are rare, and rightly so." *Turner*, 149 F.3d at 824.

2. *Legal analysis.*

 Under Iowa law, an insured may sue an insurer for a "bad faith" refusal or delay in the payment of benefits. *Dolan v. Aid Ins. Co.*, 431 N.W.2d 790, 794 (Iowa 1988). A claim for first-party bad faith arises from " 'the knowing failure to exercise an honest and informed judgment' on the part of a defendant from whom the employee seeks compensation due to work-related injuries." *McIlravy v. N. River Ins. Co.*, 653 N.W.2d 323, 329 (Iowa 2002) (quoting *Kiner v. Reliance Ins. Co.*, 463 N.W.2d 9, 12 (Iowa 1990)). In order to prevail in a claim for bad faith, the insured party must prove by substantial evidence: "(1) that the insurer had no reasonable basis for denying benefits under the policy and, (2) the insurer knew, or had reason to know, that its denial was without basis." *Id.* (quoting *United Fire & Cas. Co. v. Shelly Funeral Home, Inc.*, 642 N.W.2d 648, 657 (Iowa 2002)); *see also Seastrom v. Farm Bureau Life Ins. Co.*, 601 N.W.2d 339, 346 (Iowa 1999). The first element is objective, and the second element is subjective. *See Bellville v. Farm Bureau Mut. Ins. Co.*, 702 N.W.2d 468, 473 (Iowa 2005).

a. *Did Defendants have a reasonable basis for denying Plaintiffs' claim?*

 In considering bad faith tort cases against insurers, the Iowa Supreme Court has held that "[a] reasonable basis to deny a claim exists when the claim is fairly debatable." *See Wetherbee v. Econ. Fire & Cas. Co.*, 508 N.W.2d 657, 662 (Iowa 1993). Whether a claim is fairly debatable is generally a question of law. *Id.; see also Bellville*, 702 N.W.2d at 473. "The fact that the insurer's position is ultimately found to lack merit is not sufficient by itself to establish the first element of a bad faith claim. The focus is on the existence of a debatable issue, not on which party was correct." *Bellville*, 702 N.W.2d at 473. In essence, then, the "fairly debata-ble" test requires a plaintiff "to establish to the satisfaction of a reasonable fact finder that [the defendants'] decision ... was not based on an honest and informed judgment." *Nassen v. Nat'l States Ins. Co.*, 494 N.W.2d 231, 236 (Iowa 1992). It has long been established in first party bad faith claims that if an injured worker's claim is "fairly debatable," the court must, on proper motion for summary judgment, grant judgment as a matter of law in favor of the insurer. *See e.g., Wetherbee*, 508 N.W.2d at 662 ("Whether a claim is fairly debatable in any given situation is appropriately decided by the court as a matter of law."); *Reuter v. State Farm Mut. Auto. Ins. Co., Inc.*, 469 N.W.2d 250, 254 (Iowa 1991) ("If an objectively reasonable basis for denial of a claim actually exists, the insurer, as a matter of law, cannot be held liable for bad faith.").

 The first point of contention between the parties on the objective element of Plaintiffs' bad faith claim is whether Plaintiffs' claim for "occupational" benefits stemming from Merriam's injury was "fairly debatable" at the time Defendants denied the claim. Plaintiffs assert that Gallagher conducted a wholly inadequate investigation into the circumstances surrounding Merriam's injury, such that this Court should find that Gallagher lacked a reasonable basis for its benefits decision as a matter of law. Gallagher, on the other hand, argues that the benefits determination it made was the correct one, and that even if it wasn't, Plaintiffs' claim was "fairly debatable" as a matter of law.

On October 21, 2005, Marcy Jordan sent Merriam a letter that effectively served to deny "occupational" benefits under the CPP policy. Pls.' App. at 91. The letter stated:

RE: CPP Accident plan Claim of 3/29/05

Dear Mr. Merriam:

We have reviewed your file and the information regarding your claim of the above date. Based on the description of the accident, this claim will be paid under the non-occupational provision of the policy.

Under the Non–Occupational Coverage Rider it states:

"Non–Occupational—as used in this Rider, means, with respect to an activity, accident, incident, circumstance or condition involving an Insured Person, that it does not occur or arise out of or in the course of the Insured Person performing Occupational services for the Contractee."

Non-occupational accidents maximum benefit for your injury is up to $7,500.00 for medical expenses.

Please contact me if you have any questions. Sincerely,

Marcy Jordan, Ext. 203

Sr. Claims Representative

On Behalf of National Union Fire Insurance Company of Pittsburgh, PA

Pls.' App. at 91.

At the time that Jordan sent this letter, Gallagher had the following information, amongst other things, in its possession regarding Merriam's injuries of March 29, 2005:

(1) An "Occupational Accident Plan Claim Call–In Sheet," dated August 30, 2005, the date Plaintiffs first reported Merriam's accident to Gallagher. The form was filled in by an individual named "Carol." The claims sheet lists the date of injury as "3–29–05" and describes the accident as: "in driveway (1955 Int'l) went to lower bed—it wouldn't come down—reached across frame then bed just came down—crushed arm. Spouse took to ER." In the space next to "Accident Location," the words "727 Linn Street Boone, IA (Ins'd home)" are written. Gallagher App. at 27. Carol set the initial reserves on the claim at $7,500 medical, noting "In Personal vehicle at home." Gallagher App. at 27.

(2) A claims note dated 9–7–2005, stating that Merriam had informed Gallagher that he was under "load # JCL8662275719" at the time of his injury. Jordan contacted Landstar and was told that the number given was a phone number, not a load number, and that Landstar did not have any information about an accident on March 29, 2005 involving Merriam. *Id.* at 32.

(3) A "Loss Information Request" and "Coverage & Premium Verification" form, which was returned to Gallagher by Landstar noting only that Merriam was "Terminated 3/30/05." *Id.* at 31.

(4) The results of the "activity check" by First Advantage Investigative Service. *Id.* at 46.

(5) A completed "Accident Fact Sheet" which listed the "location" of the accident as "727 Linn St. Boone–Iowa 50036." *Id.* at 47.

(6) A completed "Trucker Occupational Accident Plan Medical Claim Form," signed by Timothy Merriam on September 22, 2005, listing his home address as "1915 West First Extension" in Boone, Iowa, but listing "727 Linn St. Boone IA" in response to the question, "where did the accident occur?" *Id.* at 48. Included with this Trucker Occupational Accident Plan Medical Claim Form was a doctor's statement signed by Dr. Doug Massop at the Mayo Clinic which responded "No" to the question, "Was this illness or injury work related?" *Id.* at 49.

(7) Merriam's "Driver's Daily Log" books. *Id.* at 54–57.

(8) A handwritten statement, signed by Merriam on September 30, 2005, stating: "I stopped at my house in Boone,

Iowa on duty not driving to work on my truck. I went and unloaded a load of gravel with my 1955 International dump truck (old grain truck). I raised and tried to lower the bed of the truck four or five times. The bed would not come down. I reached across the frame of the truck with my left arm the truck bed slammed down (with a load of gravel still on it) hitting me in the left side of my head splitting it open to the skull and pinning my left arm over the frame of the bed crushing me across the left shoulder and back." *Id.* at 58–59.

(9) A letter from James M. Ellis of Landstar dated September 30, 2005 stating that "Tim Merriam was under a load for Landstar Ranger (Freight bill # JCL 7457045) that picked up on 03.25.05 in Sparks, NV. It was to deliver on 03.30.05 in Cedar Rapids, IA. Tim's accident happened on 03.29.05. We had to send in another truck to pick up Tim's load and take it to its destination in Cedar Rapids, IA." *Id.* at 60.

(10) Various medical records related to Merriam's accident. *Id.* at 62–91.

The record is generally undisputed that Gallagher ultimately concluded that Merriam's claim was non-occupational on the basis that it occurred while he was repairing a dump truck that belonged to him personally, and that such activities were not made in furtherance of any of Merriam's duties to Landstar.

Plaintiffs assert a long list of points that they claim demonstrate the legal insufficiency of Gallagher's investigation into the circumstances surrounding Merriam's injury. Generally, Plaintiffs' allegations are that Marcy Jordan and Brenda Cullinan, as the claims adjustors for Gallagher, had a duty to adequately investigate whether Merriam's injuries "ar[ose] out of or in the course of" Merriam's duties performed "within the course and scope of contractual obligations" to Landstar. That is, Plaintiffs argue, Jordan and Cullinan failed to gather the specific facts regarding *why* Merriam was dumping gravel into his driveway, how the driveway was specially created for parking Merriam's semi-truck, and how Merriam had obligations to secure his load and about where he could and could not park his truck pursuant to his Contract with Landstar.[40] Plaintiffs argue that if Jordan and Cullinan had inquired further into these matters, they would have reached what Plaintiffs claim is an obvious and inescapable conclusion, that

---

**40.** Specifically, Plaintiffs argue that the investigation was insufficient as a matter of law because Marcy Jordan and Brenda Cullinan failed to fully investigate his claim in the following regards: 1) they failed to ask "why Timothy Merriam was using a dump truck to spread gravel on the driveway in question"; 2) they failed to get a "clear understanding of what Timothy Merriam was doing at the time of his injury"; 3) they failed to go to Boone, Iowa to investigate Merriam's injury; 4) they did not take formal statements of either Merriam or his wife "so as to determine specifically what Timothy Merriam was doing at the time of his injury and how it related to his duties and responsibilities for Landstar"; 5) they only engaged the investigative service to perform an activity check, and did not request photographs of the driveway where Merriam's injury allegedly occurred; 6) they failed to gain an understanding that there was more than one driveway on Merriam's property and to appreciate the purposes for which each driveway was used; 7) they did not take "the time to obtain a copy of [Merriam's Contract with Landstar] so as to educate themselves as to the scope of Timothy Merriam's contractual obligations to Landstar"; 8) they failed to gather information which would have revealed that the driveway where Merriam was dumping gravel was used and built "exclusively as a driveway to park his eighteen-wheeler"; and 9) they otherwise failed to understand how Merriam using his personal dump truck to fill gravel in his specially designed driveway was "in furtherance" of his obligations to Landstar. Pls.' Resistance Br. at 16–22.

is, that Merriam's injuries necessarily arose out of and in the course of his performance of services or duties for Landstar.

Plaintiffs' argument that Gallagher acted in bad faith as a matter of law because it failed to perform an adequate investigation is insufficient to establish the first, objective element of a bad faith claim, that the insurer had "no reasonable basis" for denying Merriam's claim for occupational benefits. Iowa law is well settled that an "insurer's 'subpar' investigation cannot in and of itself sustain a tort action for bad faith." *Reuter*, 469 N.W.2d at 254. Indeed, the Iowa Supreme Court has held that the investigation requirement with regard to a first-party insurance claim, such as the one here at issue, is substantially less onerous than that of a third-party bad faith claim. In a third-party claim, the insurer "owes a fiduciary duty to the insured to act responsibly.... This places a duty on the insurer to investigate the claim and take affirmative action as necessary to protect the interest of the insured." *N. Iowa State Bank v. Allied Mut. Ins. Co.*, 471 N.W.2d 824, 828 (Iowa 1991) (citing *Pirkl v. Nw. Mut. Ins. Ass'n*, 348 N.W.2d 633, 635 (Iowa 1984)). By contrast, a first-party situation is characterized as an "arm's length relationship," such that, "In a first-party action, the 'insurer has no clearly defined duty of investigation and may require the insured to present adequate proof of loss before paying the claim.'" *Id.* (quoting *Pirkl*, 348 N.W.2d at 635); *see Bellville*, 702 N.W.2d at 478 ("The testimony of the plaintiff's experts that the [insurer] failed to conduct an additional, more extensive investigation and analysis ... is simply not consistent with Iowa law. In first-party insurance situations, there is 'no clearly defined duty of investigation' on an insurer.").

Plaintiffs' assertions that Gallagher did not conduct a proper investigation is similar to the plaintiffs' argument in *Seastrom v. Farm Bureau Life Insurance Co.* 601 N.W.2d at 346. In *Seastrom*, the insured paid for and applied for a life insurance policy, but died before the policy issued. *Id.* at 341. There was evidence that the insurance agent who sold the insured the policy had made representations that a receipt for payment was proof that there was insurance coverage. *Id.* at 342. Despite a policy face value of $400,000, the insurer offered to pay only $250,000 in benefits pursuant to a maximum limitation on coverage provided for in the receipt. *Id.* The beneficiaries under the life insurance policy sued, amongst other things, for the insurer's bad faith refusal to pay the full benefit amount. *Id.* at 342. Specifically, the beneficiaries claimed that the insurer failed to conduct a proper investigation into the circumstances surrounding the purchase of the policy and the representations made to the insured. *Id.* at 347. In reversing a jury verdict in favor of the beneficiaries, the Iowa Supreme Court held that it was clear that the insurer "investigated the claim, even if such investigation was not as thorough or all-encompassing as the plaintiffs would have desired." *Id.* The Court reiterated the rule regarding investigations in first party claims and clarified the standard applicable to the first, objective element of a bad faith tort action:

> "In a first-party bad faith claim, 'an imperfect investigation, standing alone, is not sufficient cause for recovery if the insurer in fact has an objectively reasonable basis for denying the claim.'" [*Sampson v. Am. Standard Ins. Co.*, 582 N.W.2d 146, 152 (Iowa 1998)] (quoting *Reuter v. State Farm Mut. Auto. Ins. Co.*, 469 N.W.2d 250, 254–55 (Iowa 1991)). In fact, where an insurer has an objectively reasonable basis to deny coverage, it has no duty to investigate further before denying the claim. *See*

*Morgan v. American Family Mut. Ins. Co.*, 534 N.W.2d 92, 98 (Iowa 1995).

*Id.*

On the facts now before the Court, it is clear that Gallagher's did investigate Plaintiffs' claim and that its determination that Merriam's injury was "non-occupational" was entirely reasonable. Indeed, Gallagher's determination would have remained reasonable even if Gallagher obtained all of the information that Plaintiffs now claims it should have obtained. That is, even if Jordan and Cullinan clearly understood that Merriam had a special driveway on his property for parking his truck, that he frequently took his DOT required breaks at his home, that he was fully under load for Landstar at the time of his injury, and that he was putting gravel on his specially created driveway to avoid getting his truck stuck, Gallagher still would have been justified in reaching the conclusion that Merriam's injuries were non-occupational and in denying coverage under the occupational provisions of the CPP policy.

Gallagher had several objectively reasonable bases to deny coverage. First and foremost amongst these is the fact that reasonable minds could hold the position that, in undertaking to gravel his specially created driveway with his personally owned 1955 International Dump truck, with gravel previously purchased, and to then "fix" the bed of his personal 1955 International dump truck, Merriam was not acting "in furtherance" of any duty he owed to Landstar pursuant to the terms of his contract. *See Bellville*, 702 N.W.2d at 474 (" 'An insurer is innocent of bad faith as a matter of law . . . if the insurer took a

position in regard to the claim that reasonable minds could hold.' ") (quoting with approval Stephen S. Ashley, *Bad Faith Actions Liability & Damages* § 5.04, at 5–17 to 5–18 (2d ed.1997)). As Gallagher points out, nothing in Merriam's contract with Landstar required him to take DOT breaks at this home, to park his truck in any particular location, to pour gravel into a specially created driveway, or to use or employ a personal dump truck in any way.

Moreover, a reasonable person could absolutely question whether Merriam's claim was occupational or non-occupational given the discrepancies reported regarding *where* Merriam's injuries occurred. Merriam and his wife repeatedly reported to Gallagher that Merriam's accident occurred at 727 Linn Street in Boone, Iowa, the home of Merriam's mother. *See* Gallagher App. at 27 ("Occupational Accident Plan Claim Call–In Sheet," written by a Gallagher employee to commemorate Merriam's call reporting his claim, dated August 30, 2005, noting the "Accident Location" as "727 Linn Street Boone, IA (Ins'd home)"); 47 ("Accident Fact Sheet" filled in by either Timothy or Justine Merriam reporting the accident location as "727 Linn St. Boone–Iowa 50036"); 48 ("Trucker Occupational Accident Plan Medical Claim Form," signed by Tim Merriam on September 22, 2005, listing his home address as 1915 West First Extension in Boone, Iowa, but listing "727 Linn St. Boone IA" as the response to the question, "where did the accident occur?").[41] On each of these occasions, either Merriam or his wife also reported Timothy Merriam's home address as 1915 West First Extension Street.[42] Though Plaintiffs now insist

---

**41.** Plaintiffs have been unable to explain why they repeatedly reported the location of the accident as 727 Linn Street even though they claim it, in fact, occurred at 1915 West First Extension Street. Regardless of where the accident did, in reality, occur, there is no doubt

that if it occurred at 727 Linn Street, the injury could not be deemed to have arisen out of or in the course of Merriam's obligations under his Contract with Landstar.

**42.** Plaintiffs argue that at the time that Merriam reported the 727 Linn Street address to

that Merriam's accident occurred at 1915 West First Extension Street, the location of the specially created driveway for Merriam to park his truck, Gallagher was entirely within its rights to rely on information provided by Plaintiffs on at least three separate occasions listing the accident as having occurred at a different location. The question of where Merriam's injury

occurred was necessarily a "coverage-determining fact," [43] meaning that the disparity in Plaintiffs' own reporting of the location of the accident made the claim "fairly debatable" as a matter of law. *See Bellville*, 702 N.W.2d at 473 ("[I]f reasonable minds can differ on the coverage-determining facts or law, then the claim is fairly debatable.").[44]

Gallagher, he was on many "high powered painkillers." Pls' Resistance Br. at 47. The fact that Merriam was on painkillers at the time of his reports to Gallagher does not, however, necessitate a conclusion that Gallagher was not justified in relying on the information that Merriam reported. Indeed, it is only the location of the accident that is supposedly mistaken—all other information reported by Merriam is generally conceded to be accurate. Furthermore, Merriam's reports were made nearly five months after his injuries, and there is no indication that Gallagher had any information or indication that Merriam was anything less than fully competent to report information about his claim, despite the severity of his injuries. Finally, Merriam's wife, the only other witness to the accident, is the person that wrote the 727 Linn Street as the location of the injury on at least one of the forms provided to Gallagher. While she testified at deposition that 727 Linn Street is "not where it happened," *see* Pls.' App. at 208, that after-the-fact deposition testimony does not change the information that she reported to Gallagher, nor does it undermine Gallagher's reliance on the information she reported.

Plaintiffs also argue that since his accident, Merriam's memory is "absolutely horrible." Pls.' Resistance at 47. Again, there is nothing in the record to indicate that Gallagher had any way to know, *at the time it made its claims decision*, that Merriam was anything other than fully competent to report the facts surrounding his injuries. Additionally, the quality of Merriam's memory cannot explain why Justine Merriam also wrote the accident occurred at 727 Linn Street. Accordingly, Plaintiffs' argument that "there is absolutely no evidence in the claims file that this injury occurred anywhere other than the home of Tim and Justine Merriam, 1915 West 1st Extension, Boone, Iowa" is without merit. Pls.'

Resistance Br. at 49. There is clear evidence, in the form of Timothy and Justine Merriam's own written and verbal statements that the accident occurred at 727 Linn Street, which support a belief that the accident occurred somewhere other than at 1915 West 1st Extension. This evidence supplies ample support, at a minimum, for the conclusion that the question of whether Merriam's injuries were "occupational" was "fairly debatable."

43. Plaintiffs could not reasonably argue that pouring gravel on Merriam's mother's driveway was in some way "in furtherance" of Merriam's duties for Landstar. Notably, the question of whether Merriam was graveling his own driveway or that of his mother at the time of his accident is of legitimate concern. Merriam testified at deposition that he had purchased a truckload of gravel prior to his injury, in part to gravel his own "specially created" driveway for his eighteen-wheeler, and in part, because he was going to pour a base for a driveway at his mother's house. Merriam Dep. at 52–54.

44. The Court further notes that even if it had concluded that Plaintiffs' claim was *not* fairly debatable as a matter of law in considering Defendants' Motion for Summary Judgment, this would not necessarily lead to a conclusion that summary judgment in favor of Plaintiffs is warranted. With regard to Plaintiffs' Motion for Summary Judgment, Plaintiffs bear the burden of proving that the insurer had *"no* reasonable basis for denying" Merriam's claims, not just that the claims were not fairly debatable as a matter of law. *McIlravy*, 653 N.W.2d at 329 (citations omitted, emphasis added). Naturally, this standard requires a higher level of proof than does resisting Defendants' Motion for Summary Judgment.

b. *Did the insurer know it lacked a reasonable basis for denying Plaintiffs' claims?*

 Even assuming that Plaintiffs' claim was not fairly debatable as a matter of law, Plaintiffs' claim of bad faith would nonetheless fail under the subjective prong of the test, i.e., there is insufficient evidence that Gallagher "knew or had reason to know that its denial was without a reasonable basis." Plaintiffs premise their entire theory of bad faith on the notion that Gallagher performed an inadequate investigation into the circumstances under which Merriam's injuries occurred. But, as noted *supra,* in a first-party insurance case, "an improper investigation, standing alone, is not sufficient cause for recovery if the insurer in fact has an objectively reasonable basis for denying the claim." *Reuter,* 469 N.W.2d at 254–55. While never sufficient to prove the objective prong of the test, "[a]n insurer's negligent or sub-par investigation or evaluation of a claim [may nevertheless be] relevant to the fact finder's determination of whether the insurer should have known its denial lacked a reasonable basis." *Bellville,* 702 N.W.2d at 474.

Here, despite Plaintiffs' protestations to the contrary, the Court cannot even say that Gallagher conducted a sub-par investigation. Plaintiffs emphasize over and over that, if only Gallagher had asked the correct questions, it would have been obvious that Merriam's injuries were occupational. Gallagher did not perform a "subpar" investigation into Plaintiffs' claims and the Court finds there is no genuine issue of material fact on the question of the thoroughness of Gallagher's investigation. Marcy Jordan spoke to Merriam on numerous occasions, obtained information from Landstar, gathered documentation about Plaintiffs' injuries, and offered Plaintiffs numerous opportunities to provide their version of events and to explain why the claim should be deemed occupational. Plaintiffs did not take advantage of these opportunities, did not provide more detailed information regarding why the claim should be deemed occupational, and did not even file an appeal of the benefits determination, despite being specifically invited to do just that. Plaintiffs' assertion that Defendants should have done more to determine the purportedly occupational nature of Plaintiffs' claim improperly shifts the burden of proving Merriam's entitlement to benefits to Gallagher, and it ignores the fact that the insurer is entitled to " 'require the insured to present adequate proof of loss before paying the claim.' " *N. Iowa State Bank,* 471 N.W.2d at 828 (quoting *Pirkl,* 348 N.W.2d at 635); *see Terra Indus., Inc. v. Nat'l Union Fire Ins. Co.,* 383 F.3d 754, 759 (8th Cir.2004) ("Generally the burden is on the insured to show that a loss is covered by the policy." (citing 17 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 254:52 (3d ed.2001))).

C. *National Union and Gallagher's Motion for Summary Judgment on Counts IV and VI*

Count IV of Plaintiffs' Amended Complaint asserts that National Union and Gallagher are liable under the doctrine of "reasonable expectations." Specifically, Plaintiffs assert there are multiple ambiguities in the CPP policy and that all of those ambiguities must be resolved in accordance with Plaintiffs' objectively reasonable expectations that Merriam's injuries would be covered under various occupational provisions of the CPP policy. In Count VI of Plaintiffs' Amended Complaint, Plaintiffs allege that National Union and Gallagher are liable for breach of contract for failing to pay benefits in accordance with the occupational benefit provisions of the CPP policy. National Union and Gallagher (collectively referred to as "Gallagher" or "Defen-

dants" throughout this section) move for Summary Judgment on both counts. The Court will address each claim in turn.

1. *Count IV—reasonable expectations.*

 As discussed *supra*, the Iowa Supreme Court first formally adopted the doctrine of reasonable expectations in 1973 in *Rodman*, 208 N.W.2d at 905–08. The doctrine is a "narrow one" that "seeks to avoid the frustration of an insured's expectations notwithstanding policy language that appears to negate coverage." *Monroe County v. Int'l Ins. Co.*, 609 N.W.2d 522, 526 (Iowa 2000). The reasonable expectations doctrine "is carefully circumscribed and does not contemplate the expansion of coverage on a general equitable basis." *Johnson v. Farm Bureau Mut. Ins. Co.*, 533 N.W.2d 203, 206 (Iowa 1995). "It can only be invoked when an exclusion '(1) is bizarre or oppressive, (2) eviscerates terms explicitly agreed to, or (3) eliminates the dominant purpose of the transaction.'" *Id.* (quoting *Clark–Peterson Co. v. Indep. Ins. Assocs., Ltd.*, 492 N.W.2d 675, 677 (Iowa 1992)). Furthermore, "a preliminary criterion must be satisfied before [application of] the doctrine. The policy must either be such that an ordinary layperson would misunderstand its coverage, or there must be circumstances attributable to the insurer which would foster coverage expectations." *Id.* (citing *Clark–Peterson Co.*, 492 N.W.2d at 677).

The CPP policy provides the following relevant benefits in the schedule of benefits:

## OCCUPATIONAL ACCIDENT BENEFITS

**Accidental Death Benefit (lump sum):**
Principal Sum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $75,000
Incurral Period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90 Days

**Accidental Dismemberment Benefit:**
Principal Sum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $100,000
Incurral Period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90 Days
Monthly Benefit Amount . . . . . . . . . . . . . . . . . . . . . . . . $1,000

**Paralysis Benefit:**
Principal Sum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $150,000
Incurral Period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90 Days
Monthly Benefit Amount . . . . . . . . . . . . . . . . . . . . . . . . $1,000

**Temporary Total Disability Benefit:**
Commencement Period (Initial Disability) . . . . . . . . . . 180 Days
Waiting Period (Benefits payable retroactively to
 day 1 after the 7 day waiting period . . . . . . . . . . . . . 7 Days
Participation Percentage . . . . . . . . . . . . . . . . . . . . . . . . 66 2/3%
Maximum Weekly Benefit Amount . . . . . . . . . . . . . . . . 104 Weeks
Maximum Benefit Amount . . . . . . . . . . . . . . . . . . . . . . . See Continuous Total Disability Benefit

**Continuous Total Disability Benefit:**
(Not a Covered Loss until the day after the Tempo-
 rary Total Disability Maximum Benefit Period has
 been reached)
Participation Percentage . . . . . . . . . . . . . . . . . . . . . . . . 66 2/3%
Maximum Weekly Benefit Amount . . . . . . . . . . . . . . . . $400
Maximum Benefit Amount (Includes amounts pay-
 able for both the Temporary and continuous total
 Disability Benefits combined) . . . . . . . . . . . . . . . . . . $300,000 per accident

**Accident Medical Expense Benefit:**
Commencement Period . . . . . . . . . . . . . . . . . . . . . . . . . .90 Days
Maximum Incurral Period . . . . . . . . . . . . . . . . . . . . . .104 Weeks
Maximum Benefit Amount . . . . . . . . . . . . . . . . . . . . . .$1,000,000 per accident
Dental Maximum . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$1,500 per accident
Chiropractic Care Maximum . . . . . . . . . . . . . . . . . . . .$1,000 per accident

### NON–OCCUPATIONAL ACCIDENT BENEFITS

**Accidental Dismemberment Benefit:**
Principal Sum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$15,000
Incurral Period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .90 Days
Monthly Benefit Amount . . . . . . . . . . . . . . . . . . . . . . .$1,000

**Paralysis Benefit:**
Principal Sum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$15,000
Incurral Period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .90 Days
Monthly Benefit Amount . . . . . . . . . . . . . . . . . . . . . . .$1,000

**Accident Medical Expense Benefit:**
Commencement Period . . . . . . . . . . . . . . . . . . . . . . . . . .30 Days
Maximum Incurral Period . . . . . . . . . . . . . . . . . . . . . .104 Weeks
Maximum Benefit Amount . . . . . . . . . . . . . . . . . . . . . .$7,500
Dental Maximum . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$500 per accident
Chiropractic Care Maximum . . . . . . . . . . . . . . . . . . . .$1,000 per accident

### LIMITS OF LIABILITY
### OCCUPATIONAL COVERAGE

**Per INSURED Person Limit of Liability (Combined Single Limit):**
(All Covered Losses with respect to any one Occupational Accident) . . . . . . . . . . . . . .$1,000,000

### NON–OCCUPATIONAL COVERAGE

**Per Insured Person Limit of Liability (Combined Single Limit):**
(All Covered Losses with respect to any one accident . . . . . . . . . . . . . . . . . . . . . . . . . .$15,000

Pls.' App. at 131–32.

Plaintiffs assert that they had several "reasonable expectations" given the schedule of benefits and the correspondent definitions and policy language. Namely, Plaintiffs assert that they had a reasonable expectation that Merriam's accident would entitle him to: 1) "occupational" benefits; 2) paralysis benefits; and 3) occupational benefits in excess of the aggregate $1 million limitation.[45] The Court first points out that under *Vos v. Farm Bureau Life Ins. Co.*, Plaintiffs' claims are untenable on their face because "[t]he party asserting the doctrine of reasonable expectations must show not only the expectations, but also that they were *relied upon* by the insurance purchaser in deciding to buy the

---

**45.** Plaintiffs' Amended Complaint asserts that Merriam's injury was: 1) "in the nature of an accidental dismemberment of his left arm even though his arm was surgically salvaged"; 2) "that he is entitled to paralysis benefits under the policy by reason of the fact that his left arm is nonfunctional and worthless in the aftermath of his injury"; 3) "that he is entitled to temporary total disability benefits from the date of the injury for a total of one hundred four (104 weeks at four hundred dollars ($400) per week"; 4) "that he is entitled to continuous total disability benefits for the rest of his life up to a maximum of three hundred thousand dollars ($300,000)"; and 5) "that he is entitled to accidental medical expense benefits up to a maximum of one million dollars (the precise total of his medical expenses incurred by reason of the injury has not yet been conclusively determined but is known to be in excess of $500,000)." Am. Compl., Count IV, ¶ 13.

policy." 667 N.W.2d 36, 50 (Iowa 2003). Here, the only expectation that Merriam harbored was his claimed belief that "coverage would protect me anytime I was outside my truck." Pls.' App. at 5. This belief, however, did not arise from the policy language itself or from anything that either Gallagher or National Union told Merriam. Rather, it supposedly arose from information Merriam received from Landstar, an entity that is not even a party to the present reasonable expectations claim. Thus, even if Landstar's statements were sufficient to foster coverage expectations, there is no evidence that Plaintiffs' coverage expectations in this regard were in any way attributable to National Union or Gallagher. *See Clark–Peterson Co.*, 492 N.W.2d at 677 (stating there "must be circumstances *attributable to the insurer* which would foster coverage expectations" (emphasis added)). Moreover, even if Plaintiffs could overcome this "insurmountable reliance issue," each of their claims of reasonable expectations suffer from additional fatal flaws, as detailed *infra.*

a. *"Occupational" benefits.*

■ Plaintiffs first argue that there are genuine issues of material fact as to "whether an ordinary layperson would likely understand the policy's coverage as to this occurrence being an occupational injury." Pls.' Resistance Br. at 4. The term "occupational," as defined by the policy, means:

> [W]ith respect to an activity, accident, incident, circumstance or condition involving an insured Person, that it occurs or arises out of or in the course of the Insured Person performing services within the course and scope of contractual obligations to the Contractee. Occupational does not encompass any peri-

od of time during the course of everyday travel to and from work.

Pls' App. at 134.

Plaintiffs insist that an ordinary layperson would reasonably believe that Merriam's activities at the time of his injury were "occupational," within the meaning of the policy language. Plaintiffs urge that it was "conclusively shown" that Merriam was "under load" for Landstar at the time of the accident and that he was "fulfilling additional duties and responsibilities at the time of his accident." Pls.' Resistance Br. at 5. The problem with Plaintiffs' argument, however, is that it is entirely premised on what Plaintiffs view as the inescapable conclusion that Merriam's injuries occurred within the context of his occupational duties, i.e., that his injures "occur[ed] or ar[o]se out of or in the course of [Merriam] performing services within the course and scope of contractual obligations to [Landstar]." This premise ignores the well-established legal concept, discussed *supra* with respect to Plaintiffs' bad faith claim, that "[a]n insurance company has the right to debate claims that are 'fairly debatable.'" *Sampson v. Am. Standard Ins. Co.*, 582 N.W.2d 146, 150 (Iowa 1998). Thus, Plaintiffs' argument is not that he had reasonable expectations under his CPP policy that were frustrated by terms in the policy that negated his expectations. *See Farm Bureau Mut. Ins. Co. v. Sandbulte*, 302 N.W.2d 104, 112 (Iowa 1981) ("The rationale of the reasonable expectations doctrine is that, in a contract of adhesion, such as an insurance policy, form must not be exalted over substance, and that the reasonable expectations of the insured may not be frustrated 'even though painstaking study of the policy provisions would have negated those expectations.'" (citations omitted)). Rather, Plaintiffs' argument is that Gallagher incorrectly decided, *under the terms of the policy as written,* that Merriam's injuries

were not suffered while Merriam was "performing services within the course and scope of contractual obligations to [Landstar]." Accordingly, Plaintiffs' challenge to the Gallagher's determination that Merriam's injuries are non-occupational is, simply put, not the type of claim intended to be cognizable under the doctrine of reasonable expectations.[46]

Here, there is no ambiguity that occupational injuries are covered under the CPP policy. There is no ambiguity that an occupational injury is one that "arises out of or in the course of the Insured Person performing services within the course and scope of contractual obligations to the Contractee." Likewise, there is no exclusion in operation that is preventing Plaintiffs from recovery under the policy despite the

undisputed definition of "occupational." Rather, Merriam was denied occupational benefits because Gallagher had sufficient evidence to cause it to believe that, even if the events happened as Merriam claimed they did, he was not at the time of his injury acting pursuant to his *contractual obligations* to Landstar. More importantly, Gallagher had sufficient reason to question whether Merriam's injuries even occurred in the manner he claimed they did, i.e., whether the injuries occurred at his own home on Extension Street or at his mother's home on Linn Street. This is not a situation where the Plaintiffs had a reasonable expectation under the CPP policy that Merriam would be covered while making repairs to the driveway where he parked his eighteen wheeler. Rather, it is

**46.** Iowa reasonable expectations cases follows a predictable pattern. An insured purchases an insurance policy to protect them from liability in a certain situation. The insured then faces a situation where liability may be imposed, only to discover that the insurance policy contains an exclusion for the particular type of situation giving rise to liability. For example, in *Clark–Peterson*, the plaintiff purchased a "contractors' umbrella liability policy," in part because the policy contained coverage for liability arising out of "discrimination." 492 N.W.2d at 676. The plaintiff was ultimately found liable for intentional discrimination, but was denied insurance coverage under the policy pursuant to policy provisions that excluded coverage for "intentional acts." *Id.* at 676–77. The Iowa Supreme Court found that the plaintiff was entitled to coverage under the "reasonable expectations doctrine" because the situation giving rise to liability for intentional discrimination was unusual and controversial (the finding of intentional discrimination arose from the firing of an employee for alcoholism) and because an ordinary layperson expecting coverage for discrimination would have believed there to be coverage. *Id.* at 678. Likewise, in *Grinnell Mutual Reinsurance Co. v. Voeltz*, plaintiffs, a husband and wife, purchased a mobile home property and liability policy. 431 N.W.2d 783, 784 (Iowa 1988). At some point, the wife began babysitting the children of her husband's sister, receiving occasional compensation on an "as-needed" basis. *Id.* One of the children was injured while in the wife's care and the plaintiffs were sued for negligence. *Id.* Coverage was denied pursuant to a policy exclusion which stated, "We do not cover bodily injury or property damage arising out of business pursuits of an insured person." *Id.* at 785. The Iowa court found that plaintiffs were entitled to coverage under the policy because "the average person would certainly not expect his or her baby-sitting activities to be excluded [where, as here, the] agent was made aware of these activities and made no further inquiries." *Id.* at 788. And, as noted previously, in *C & J Fertilizer*, the plaintiff purchased insurance, including insurance for burglary, but was denied coverage due to a definition of burglary that required visible marks of force on the exterior of the burgled building. 227 N.W.2d at 176. In each of these cases of recovery under the reasonable expectations doctrine, the plaintiffs would have had their claims covered under the broad provisions of the policy, *but for* some particular exclusion or policy language that an average person would not have foreseen as barring coverage. There was *not* a question, as there is in the present case, as to whether the facts giving rise to the claim happened as the insured claimed.

a situation where Plaintiffs have offered facts which give rise to a belief that coverage may be warranted as occupational, but where additional facts exist to warrant Gallagher's contrary conclusion that Merriam's injuries were not occupational. That is, "reasonable minds can differ on the coverage-determining facts," meaning that the claim is "fairly debatable" as a matter of law, and that Gallagher was entitled, as a matter of law, to deny Plaintiffs' claim on that basis. *See City of Madrid v. Blasnitz*, 742 N.W.2d 77, 82 (Iowa 2007) (stating that courts are not tasked with "'weigh[ing] the conflicting evidence that was before the insurer,'" but rather with determining "'whether evidence existed to justify denial of the claim'" (quoting *Bellville*, 702 N.W.2d at 473–74)). Accordingly, Plaintiffs' claim that he reasonably expected "occupational" benefits fails as a matter of law.

b. *Paralysis benefits.*

 Plaintiffs assert that they reasonably expected that Merriam's injury would give rise to the payment of a paralysis benefit under the CPP policy. Clearly, as articulated above, the policy did provide for a paralysis benefit under both the occupational and the non-occupational provisions of the policy. Section IV of the policy provides the following explanatory language regarding the paralysis benefit:

> **Paralysis Benefit.** If injury to the Insured Person results in any Type of Paralysis specified below, within the Incurral Period shown in the Schedule ..., the Company will pay a monthly benefit equal to the Monthly Benefit Amount shown in the Schedule....

>
> | | Percentage of |
> | --- | --- |
> | *Type of Paralysis:* | *....Principal Sum* |
> | Quadriplegia .......... | 100% |
> | Paraplegia ............ | 50% |
> | Hemiplegia ........... | 50% |

"Quadriplegia" means the complete and irreversible paralysis of both upper and both lower limbs. "Paraplegia" means the complete and irreversible paralysis of both lower limbs. "Hemiplegia" means the complete and irreversible paralysis of the upper and lower limbs of the same side of the body. "Limb" means entire arm or entire leg.

Pls.' App. at 137. Plaintiffs concede that Merriam's injuries do not meet the definition of "paralysis" under the terms of the CPP policy.

As noted previously, "a preliminary criterion must be satisfied" before Plaintiffs are entitled to application of the reasonable expectations doctrine. *Johnson*, 533 N.W.2d at 206 (citing *Clark–Peterson*, 492 N.W.2d at 677). That is, "[t]he policy must either be such that an ordinary layperson would misunderstand its coverage, or there must be circumstances attributable to the insurer which would foster coverage expectations." *Id.* (citing *Clark–Peterson Co.*, 492 N.W.2d at 677). Here, Plaintiffs do not argue that Gallagher fostered incorrect coverage expectations. Rather, they argue that it is "unclear ... whether an ordinary layperson would read the definitional fine print as regarding what types of paralysis are covered under the [CPP], or whether that person would reasonably misunderstand the coverage as protecting the insured in the event of 'paralysis' as the term is commonly construed and as it's contained on page 2 [the Schedule of Benefits page]." Pls.' Resistance Br. at 9. Plaintiffs highlight the fact that the definition of "paralysis benefit" is "located on page 5 amidst a swath of other definitions." *Id.*

The Court finds as a matter of law that Plaintiffs have failed to satisfy the preliminary criterion necessary for application of the reasonable expectations doctrine. No ordinary layperson would expect any form of "paralysis" to be covered simply on the basis that the Schedule of Benefits provides a "paralysis benefit." Moreover, to adopt Plaintiffs' reasoning would imply

that an insured never has an obligation to read an insurance document at all. The *law* of reasonable expectations, however, asks whether "an ordinary insured would reasonably believe the policy's [paralysis benefit] applied to him *after reading* [the definition of the term paralysis]." *Rodman*, 208 N.W.2d at 907 (emphasis added). There is nothing ambiguous in the definition of paralysis as written in the CPP policy. Indeed, the definition very clearly and unambiguously makes clear that more than one limb must be paralyzed for the paralysis benefit to apply. Thus, "an ordinary layman would not misunderstand his coverage from a reading of the policy." *Id.; see Krause v. Krause*, 589 N.W.2d 721, 728 (Iowa 1999) ("Because the language of the [policy provision at issue] is not ambiguous, [plaintiffs] would have no valid reasonable expectations of ... coverage.").[47] Accordingly, Plaintiffs' claim that he reasonably expected paralysis benefits is without merit.

c. *Aggregate policy limits.*

Plaintiffs next argue that they had a reasonable expectation that the aggregate policy limit for occupational benefits would be in excess of $1 million. Plaintiffs base this argument on the fact that if one adds up the maximum benefits listed on the Schedule of Benefits, it totals $1,491,600. Plaintiffs arrive at this figure by adding the maximum paralysis benefit of $150,000, the full temporary total disability benefit of $41,600 (104 weeks for a maximum weekly benefit of $400), the maximum continuous total disability benefit of $300,000, and the maximum medical expense benefit

of $1,000,000. Plaintiffs then make the rather incredible argument that:

> [o]n the face of the occupational accident benefits schedule, it in no way provides that there is a one million dollar total limit of exposure under the occupational benefits schedule. Further, even under the limits of liability for occupational coverage that is set forth on the next page of the benefits schedule, a reasonable expectation would be that there is a maximum of two million dollars worth of coverage. Further, under the benefits schedule, nowhere does it provide that the medical benefits are secondary to any health insurance coverage which the insured has available through other sources.

Pls.' Resistance Br. at 11.

▮ Plaintiffs' argument in this regard is entirely frivolous. First, in counting $41,600 in temporary total disability benefits, Plaintiffs are blatantly ignoring the plain language on the Schedule of Benefits, under the continuous total disability benefit section, where it states that the maximum benefit amount for the continuous total disability benefit is $300,000, which "includes amounts payable for *both the Temporary and Continuous Total Disability Benefits combined.*" Pls.' App. at 131 (emphasis added). Second, the Court simply cannot fathom how any ordinary layperson would believe that the aggregate limits of the occupational benefits would be $2 million. Under a bold heading that states **"LIMITS OF LIABILITY,"** there is bold lettering which very clearly and unambiguously states **"*Per Insured* Person Limit of Liability."** *Id.* at 132 (italics

---

47. Plaintiffs also argue that applying the clearly worded paralysis definition to the paralysis benefit would "eliminate[ ] the entire purpose for which one would enter into this type of agreement ... namely, for protection in the event they are unable to work." Pls.' Resistance Br. at 9–10. The argument is baseless. Plaintiffs have failed to demonstrate the preliminary criterion that an ordinary layperson would misunderstand the coverage as written, meaning that the Court need not even consider whether the policy language "eliminates the dominant purpose of the transaction." *Clark–Peterson Co.*, 492 N.W.2d at 676–77.

added). Finally, while the Schedule of Benefits does not expressly provide that medical benefits payable under the policy are secondary to any health insurance coverage available to the insured, the policy itself clearly and unambiguously provides, under the heading "Excess Benefits," that when an insured person has coverage under the CPP policy and "health care coverage under one or more other Plans ... [t]his Plan is an excess plan which has its benefits determined in excess of the benefits of the other plan...." *Id.* at 142. Plaintiffs have, therefore, failed to satisfy the preliminary criterion for application of the reasonable expectations doctrine, that is, Plaintiffs have utterly and completely failed to demonstrate that "an ordinary insured would reasonably believe" that the aggregate policy limits and excess benefits provisions were anything other than what was clearly and unambiguously stated in the policy.

### 2. Count VI: Breach of Contract.

■ In Count VI of Plaintiffs' Amended Complaint, Plaintiffs assert that National Union and Gallagher are liable for breach of contract arising from the failure to pay temporary total disability benefits, continuous total disability benefits, and accidental medical expense benefits under the "occupational" benefits schedule of the CPP policy. To succeed on a claim for breach of contract, Plaintiffs must establish by a preponderance of the evidence: 1) that the parties were capable of contracting; 2) that a contract existed between the Plaintiffs and Defendants; 3) the existence of consideration; 4) the terms of the contract; 5) that the Plaintiffs performed what the contract required; 6) that Defendants breached the contract in

some particular way; and 7) that the Plaintiffs suffered damage as a result of Defendants' breach. *See Magnusson Agency v. Pub. Entity*, 560 N.W.2d 20, 25 (Iowa 1997). The only issue in dispute in this action is whether Defendants breached the contract for insurance.

The Court first points out that Plaintiffs' Brief in Resistance to Defendants' Motion for Summary Judgment does not specifically resist Defendants' request for summary judgment on the breach of contract claim. *See* Pls.' Resistance Br. (Clerk's No. 62). This lack of resistance alone provides a sufficient basis for an entry of summary judgment on the claim and the Court, in fact, grants summary judgment in favor of Defendants on this basis. *See* Local Rule 56(b) (requiring a party resisting a motion for summary judgment to file a "brief ... in which the resisting party responds to each of the grounds asserted in the motion for summary judgment"). Even were the Court to consider the merits of Plaintiffs' breach of contract claim; however, the claim would still not survive summary judgment.

■ The critical question before the Court is whether Merriam's injuries "[arose] out of or in the course of [Merriam] performing services within the course and scope of contractual obligations to [Landstar]," i.e., whether Merriam's claim was "occupational" within the meaning of the CPP policy. Plaintiffs argue [48] that because the CPP policy defines the phrase "occupational" as "arising out of" the insured person performing services within the course and scope of contractual obligations to the Contractee, but does not further define the terms "arising out of" or "within the course and scope of," that the Court must look to other authorities to

---

48. Plaintiffs' argument is actually made in the context of Plaintiffs' resistance to Defendants' Motion for Summary Judgment on the bad faith claim. The Court presumes for present

purposes that Plaintiffs would make the same arguments with regard to the breach of contract claim had they responded to Defendants' motion on that issue.

define those phrases. Specifically, Plaintiffs urge the Court to look to Iowa workers' compensation law for definitions of those phrases.[49] Plaintiffs' argument suffers from a fundamental flaw, namely, it ignores the basis principles of contract construction and interpretation:

It is the cardinal principle of contract construction that the parties' intent controls; and except in cases of ambiguity, this is determined by what the contract itself says. *See generally* Iowa R.App. P. 14(f)(14); *Berryhill v. Hatt*, 428 N.W.2d 647, 654 (Iowa 1988). When a contract is not ambiguous, it will be enforced as written, *Spilman v. Board of Directors*, 253 N.W.2d 593, 596 (Iowa 1977), but when there are ambiguities in a contract, they are strictly construed against the drafter. *Village Supply Co. v. Iowa Fund, Inc.*, 312 N.W.2d 551, 555 (Iowa 1981); *Fashion Fabrics of Iowa, Inc. v. Retail Investors Corp.*, 266 N.W.2d 22, 27 (Iowa 1978); *Rector v. Alcorn*, 241 N.W.2d 196, 202 (Iowa 1976). Ambiguity exists when, after application of pertinent rules of interpretation to the face of the instrument, a genuine uncertainty exists concerning which of two reasonable constructions is proper. *Berryhill*, 428 N.W.2d at 654; *Gendler Stone Prod. Co. v. Laub*, 179 N.W.2d 628, 631 (Iowa 1970). The test for ambiguity is an objective one: "Is the language fairly susceptible to two interpretations?" *Central Bearings Co. v. Wolverine Ins. Co.*, 179 N.W.2d 443, 445 (Iowa 1970).

*Iowa Fuel & Minerals, Inc. v. Iowa State Bd. of Regents*, 471 N.W.2d 859, 862–63 (Iowa 1991).

An ambiguity does not exist simply because the parties disagree on the meaning of a phrase. *Sandbulte*, 302 N.W.2d at 108. Here, the parties do not actually disagree about the meaning of the phrases. Plaintiffs are not espousing one interpretation for the terms while Defendants espouse another. Indeed, the phrases used to define the term "occupational" are not fairly susceptible to two interpretations. Rather, what the parties disagree about is the correctness of Defendants' determination that the factual circumstances of Plaintiffs' injury did not satisfy the definition of "occupational." This does not, however, make anything about the policy ambiguous such that the Court must undertake to interpret the meaning of the policy.

■ When a term is unambiguous, but otherwise undefined, the rules of contract construction require courts to give the term the meaning that a reasonable person would ascribe to the term, avoiding any strained or unnatural interpretations. *See Cont'l Ins. Co. v. Bones*, 596 N.W.2d 552, 555–56 (Iowa 1999); *Farm & City Ins. Co. v. Potter*, 330 N.W.2d 263, 265 (Iowa 1983). The Court has carefully reviewed the terms of Merriam's Contract with Landstar and simply cannot conclude that a reasonable person could find that Merriam's activities "occur[red] or ar[ose] out of or in

---

**49.** Plaintiffs reference *Burt v. John Deere Waterloo Tractor Works*, 247 Iowa 691, 73 N.W.2d 732 (Iowa 1955) as providing the appropriate definition for the phrase "arising out of." In *Burt*, the Iowa Supreme Court found that, for purposes of the Iowa workers' compensation statute, an injury "arises 'out of the employment[ ]' when there is apparent to the rational mind, *upon consideration of all the circumstances*, a causal connection between the conditions under which the work is required to be performed and the resulting injury. Under this test, if the injury can be seen to have followed as a natural incident of the work and to have been contemplated by a reasonable person *familiar with the whole situation* as a result of the exposure occasioned by the nature of the employment, then it arises 'out of' the employment." *Id.* (quoting *In re McNicol*, 215 Mass. 497, 102 N.E. 697 (1913)).

the course of" Merriam's "performing services within the course and scope of contractual obligations" to Landstar. At the time of his injury, Merriam was fixing a malfunctioning personally owned vehicle. Nothing in Merriam's contract with Landstar could reasonably have foreseen such an activity as being "within the course and scope of" Merriam's contractual duties and obligations to haul cargo in his tractor/trailer for Landstar.

Even were the Court to apply the Iowa statutory workers' compensation definition[50] of the term "arising out of," Plaintiffs' claim cannot reasonably be found to "arise out of" his contractual obligations to Landstar.[51] The term "arising out of" under Iowa workers' compensation law:

> refers to the cause and origin of the injury. This element requires proof that a causal connection exists between the conditions of the employment and the injury. *Lakeside Casino,* 743 N.W.2d at 174. Thus, "the injury must not have coincidentally occurred while at work, but must in some way be caused by or related to the working environ-

ment or the conditions of [the] employment." *Miedema [v. Dial Corp.],* 551 N.W.2d [309,] 311 [(Iowa 1996)]. Stated another way, "[t]he injury must be a natural incident of the work. This means it must be a rational consequence of a hazard connected with the employment." *Cedar Rapids Cmty. Sch. v. Cady,* 278 N.W.2d 298, 299 (Iowa 1979). *Ottumwa Reg'l Health Ctr. v. Mitchell,* No. 07–1496, 2008 WL 1699806, at *4 (Iowa Ct.App. April 9, 2008). " 'If the nature of the employment exposes the employee to the risk of such an injury, the employee suffers an accidental injury arising out of and during the course of employment.' " *Id.* (quoting *Hanson v. Reichelt,* 452 N.W.2d 164, 168 (Iowa 1990)). Given the facts before it, the Court fails to see how getting one's arm crushed in the bed of a personally owned dump truck is a "rational consequence of a hazard connected with" hauling cargo in a tractor/trailer. There is nothing inherent in the nature of Merriam's employment situation with Landstar, or by virtue of his Contract with Landstar, that would rationally expose him

---

**50.** The Court notes that even if the terms in the Contract were ambiguous, Iowa workers' compensation law would not provide the first choice for interpreting them, as the definitions therein are highly specialized creatures of statutory law.

**51.** Assuming that Merriam's DOT status was "on duty, not driving," as Plaintiffs emphasize throughout the pleadings, this fact might be sufficient to satisfy the "in the course of" requirement of Iowa workers' compensation law, which "refers 'to the time, place, and circumstances of the injury.' " *Lakeside Casino v. Blue,* 743 N.W.2d 169, 174 (Iowa 2007). "To satisfy this requirement, the injury must take place within the period of the employment, at a place where the employee reasonably may be, and while the employee is fulfilling work duties or engaged in doing something incidental thereto." *Id.* (internal citations omitted). The DOT status would not, however, be sufficient to satisfy the "arises out of" requirement of Iowa workers'

compensation law, as discussed further *infra.* Indeed, many injuries may occur "in the course of" one's employment, but do not necessarily "arise out of" that employment. Moreover, the definition of "occupational" in the CPP policy here at issue does not merely require that an injury "arise out of" and "in the course of" employment. It requires that an injury arise out of or in the course of "the Insured Person performing *services within the course and scope of contractual obligations* to the Contractee." This is a more restrictive description of "occupational" than that under Iowa workers' compensation law. Thus, even if the Court were to find that Merriam's injuries arose out of and in the course of his employment under Iowa workers' compensation law, Plaintiffs would still have to show that he was performing services within the course and scope of his contractual obligations to Landstar. As discussed *supra* and *infra,* Plaintiffs have not made such a showing.

to such a risk. *See Koehler Elec. v. Wills,* 608 N.W.2d 1, 4 (Iowa 2000) (citing Larson, *Workers Compensation Law* § 12.14(b), at 3–371 for the proposition that the law requires "the employment contribute something *to the risk,* before pronouncing the injury one arising out of the employment.").

Finally, the Court notes that "[a] breach of a contract is a party's failure, without legal excuse, to perform any promise which forms a whole or a part of the contract." *Magnusson Agency,* 560 N.W.2d at 27 (citing 17A Am.Jur.2d, Contracts § 716, at 727). On the present record, Gallagher had a legal excuse to deny coverage under the terms of the policy, i.e., Merriam was not performing an activity that "arises out of or in the course of ... performing services within the course and scope of contractual obligations to [Landstar]." Gallagher was further warranted in denying occupational benefits on the basis that it had three different statements provided by Plaintiffs that Merriam's injuries occurred at his mother's home at 727 Linn Street, a location that would, without dispute, bar occupational coverage under the policy. Accordingly, Plaintiffs' claim for breach of contract cannot survive summary judgment.

## IV. CONCLUSION

For the reasons stated herein, Landstar's Motion for Summary Judgment (Clerk's No. 20) is GRANTED. Plaintiffs' Motion for Summary Judgment (Clerk's No. 40) and Plaintiffs' "Supplemental Motion for Summary Judgment" (Clerk's No. 44) are DENIED. National Union's and Gallagher's Motion for Summary Judgment (Clerk's No. 55) is GRANTED.

IT IS SO ORDERED.